(Decided March 31st, 1897).

---

SARAH G. MACGILL, by her Husband and Next Friend, *vs.* JAMES McEVOY, Guardian of ISA-BELLA B. GRAHAM.

*Appeal— Guardian and Ward—Orphans' Court—Appeal Lies from an Order Refusing to Remove a Guardian—A Guardian's Management of the Estate Held not to be Such as to Justify his Removal.*

An appeal lies from an order of the Orphans' Court refusing to remove a guardian, and dismissing a petition asking for his removal filed under Code, Art. 93, sec. 232.

The Orphans' Court has discretionary power under Code, Art. 93, sec. 232, to remove a guardian for improper conduct or incapacity to fulfill the duties of the office, but this power cannot be exercised arbitrarily. To justify a removal some cause must exist, and if the

assigned cause be inadequate, or, being adequate is not sustained by the evidence, the guardian cannot be lawfully removed.

A petition for the removal of the guardian of the estate of a ward alleged that the income of the estate had largely decreased owing to the guardian's wasteful extravagance; that he had neglected the duties of the office on account of illness and absence; that he had allowed the taxes to accumulate, &c. *Held*,

1st. That although the income of the estate had been reduced and some part of the *corpus* had been expended by the guardian, yet, since the evidence showed that the diminution of income was owing to causes for which the guardian was not responsible, and the expenditure of the *corpus* was rendered necessary by the nature of the property in which a part of the estate was invested, and was made under orders of the Orphans' Court, this did not constitute ground for his removal.

2nd. That the mistakes made in the statement of some of the guardian's accounts did not arise from incompetence or dishonesty and were corrected in subsequent accounts, and were not a ground for removal.

3rd. That under the circumstances of the case, the failure of the guardian to keep down the taxes on the estate ought not to be regarded as improper conduct on his part.

4th. That the fact that the guardian sold a part of the ward's property without an order of the Orphans' Court, as required by Code, Art. 93, sec. 173, but when he acted under the *bona fide* belief that he had obtained such permission, is not sufficient cause for his removal, no real loss having thereby accrued to the estate.

5th. That although the guardian's ill health had at a previous time caused him to be absent for some months, yet there was no evidence that any loss had been thereby occasioned, and his health having been restored before the filing of the petition, this circumstance was no ground for his removal from office.

Appeal from an order of the Orphans' Court of Baltimore City, dismissing a petition filed by the appellant asking for the removal of James McEvoy as guardian of Isabella B. Graham and the appointment of another person in his place.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE, BOYD and RUSSUM, JJ.

*Wm. Pinkney Whyte* and *Talbot J. Albert*, for the appellant.

*Bernard Carter* and *Frederick W. Brune,* for the appellee.

McSHERRY, C. J., delivered the opinion of the Court.

In October, eighteen hundred and ninety, George B. Graham died intestate, possessed of a large estate and leaving a widow and one child—a daughter of about three years of age—surviving him. Beginning with the year eighteen hundred and eighty-two and up to the time of his death he conducted the storage business, and James McEvoy was his confidential. clerk and agent. The storage business was then a new but thriving enterprise. In the outset it was carried on in a large warehouse—the old Wood, Weeks and Company's sugar refinery—and proved to be quite successful; and shortly before his death Mr. Graham erected and partially completed another large structure on the corner of Park and Dolphin streets, in Baltimore, with a view of extending and increasing the storage business. This building was not entirely finished when Mr. Graham died. Both of these warehouses were leasehold property and belonged to Mr. Graham. His widow renounced her right to administer on his estate and recommended Mr. McEvoy as administrator; and the latter was also at her instance appointed guardian of the estate, but not of the person of her infant daughter, by the Orphans' Court of Baltimore City. In eighteen hundred and ninety-four Mrs. Graham, the widow, married Carroll S. Macgill, and in eighteen hundred and ninety-six she, by her husband as next friend, filed a petition in the Orphans' Court praying for the removal of Mr. McEvoy as guardian. To this petition an answer was filed and quite a volume of evidence was taken. After a hearing the Orphans' Court refused to remove the guardian and dismissed the petition seeking his displacement, and from that order of dismissal the pending appeal was taken. A motion has been made to dismiss the appeal upon the ground that as the order from which the appeal was taken was one that was passed by the Orphans' Court in the exercise of a *discretion* given to it by the statutes of Maryland, no appeal

will lie; because—such is the contention—no appeal will lie from any adjudication upon a subject confided exclusively to the discretion of an inferior tribunal.

As this motion meets us at the threshold of the case it will be considered and disposed of at once.

The precise question raised on this motion is this: Can a party who has filed a petition in the Orphans' Court under section 232 of Article 93 of the Code for the removal of a guardian appeal from an order refusing to remove the guardian and dismissing the petition? As thus presented the question is one of first impression—it has not heretofore arisen in this Court.

That part of the section just alluded to that bears on the motion to dismiss is in these words: "The Court may, on the application of any infant or anyone in his behalf, suggesting improper conduct in any guardian whatever, * * * inquire into the same, and *at its discretion* remove such guardian and make choice of another, &c." It is insisted that as the section places the power of *removal* at the *discretion* of the Orphans' Court no appeal lies from any exercise of that discretion. Of course, the contention to be tenable at all must go the entire length and maintain that no appeal lies whichever way the discretion may be exercised. If the subject-matter is in fact exclusively committed to the discretion of the Orphans' Court, then, incontestibly, no appeal would lie from an order *removing* the guardian, if no appeal could be prosecuted from an order *refusing* to remove him. And if an appeal does lie from an order *removing* a guardian under *this section* of the Code, then the appeal must lie only because the section does *not* give to the Orphans' Courts such a discretion as cannot be reviewed. If the *power* is strictly discretionary then the discretion is co-extensive with the power itself, and consequently *no* exercise of *that* power could ever be reviewed on appeal. But it has been distinctly and explicitly held in *Slattery* v. *Smiley*, 25 Md. 394, that an order passed under this very section *removing* a guardian was open to review on appeal—the

appeal was entertained and the order removing the guardian was reversed, because there were no facts alleged or shown which justified the removal. But if the power to remove had been lodged solely with the inferior Court the mere failure to make appropriate averments or to sustain them by evidence would have been no reason whatever for a reversal of the order directing the guardian's removal if the section of the Code now under consideration gave to the Orphans' Court such a discretion as could not be reviewed in any event. Now, the power to grant a new trial is in the discretion of the trial Court, but no matter how erroneous a refusal to award a new trial may be, the decision denying it can never be reviewed on appeal ; and this, too, even though it affirmatively and conclusively appears by the record that the party who succeeded in recovering a verdict was manifestly and obviously not entitled to prevail. There can be no pretence that the Orphans' Courts have in such instances as are now before us any such discretion as this. Under section 241 of Art. 93 of the Code, whereby the Orphans' Courts are empowered " *in their discretion* " to revoke letters of administration, it has been held, notwithstanding the seeming discretion entrusted to them, that an appeal will lie by an administrator whose letters have been revoked ; *Forney* v. *Shriver*, 60 Md. 419, though in cases arising under section 237 of the same Article (which is a transcript of the Act of 1831, ch. 315, sec. 4), it has been decided that an appeal would *not* lie. *Porter* v. *Timanus*, 12 Md. 292. Section 237 provides that the Orphans' Court shall be " Empowered in their discretion *and whenever to them it shall seem proper*, either *ex-officio* or upon application " to remove an executor or administrator for failing to bring money into Court for investment when ordered to do so. It was intimated at the argument that if no appeal could be entertained in this latter class of cases there was no reason why one should be permitted in the one at bar. But it is very apparent, it seems to us, there is a broad and well-defined difference between the provisions of sec. 237 and

those of sections 241 and 232.   By sec. 237 there is no
doubt that a clear, unequivocal discretion, in its widest
sense, is conferred upon the Orphans' Court.   The language
is explicit and free from ambiguity.   Those Courts are by
that section empowered to remove an administrator for re-
fusing to bring money into Court, not only in their discre-
tion—the terms employed in sec. 232—but "whenever *to
them* it shall seem proper."   The broad power is committed
without qualification "*to them*"—the Orphans' Courts—to
be exerted whenever *they* shall think proper to use it; and
from *their* decision in such cases obviously no appeal can
be prosecuted.   But the discretion conferred by sections
232 and 241 is a sound, legal discretion to be used conform-
ably to the settled rules of law—to be exercised if the facts
warrant it, to be withheld if they do not—and if erroneously
exerted in either direction the determination is subject to
review on appeal.   The sweeping and comprehensive terms
of section 58, Art. 5 of the Code, give a right of appeal
from the Orphans' Courts in these words :   "From all de-
crees, orders, decisions and judgments made by the Orphans'
Courts the party who may deem himself aggrieved by such
decree, order, decision or judgment, may appeal to the Court
of Appeals."   Unless the right of appeal thus broadly con-
ferred upon litigants is restricted, narrowed or taken away
by some particular contrary provision, either expressly de-
nying an appeal, or impliedly prohibiting it by giving an
irreviewable discretion to the lower Court, the right to ap-
peal must be held to exist.   If the discretion conferred by
sec. 232 is of such a limited character that it will not pre-
vent an appeal from an order *removing* a guardian, it is
difficult to see how, logically, an appeal from an order *re-
fusing* to remove a guardian could be denied.   It is not the
*manner* in which a discretion has been exercised that de-
termines whether an appeal will lie—that is, it is immaterial
whether the decision complained of has been affirmative or
negative action—the question as to whether an appeal will
lie at all in such cases depends altogether upon whether an

exclusive discretion over the subject-matter has been committed alone to the lower Court. We find nothing in the words of sec. 232 to warrant the conclusion that the Legislature intended to clothe the Orphans' Courts with a broad irreviewable power to remove or to refuse to remove a guardian, just as whim or caprice might dictate; and we consequently hold that their decisions under this section of the Code are open to examination on appeal. We are not to be understood, however, as qualifying in any way any ruling of this Court denying the right of appeal from the Orphans' Court in other and different instances. The motion to dismiss this appeal is overruled.

We now come to the merits of the controversy. The petition for the removal of Mr. McEvoy, after making reference to and setting forth some of the balances shown by several of the guardianship accounts settled by him, proceeds to allege the grounds upon and on account of which the removal is sought; and these are five in number, and may be briefly summarized as follows: First, that though the infant was possessed of a large and lucrative estate, the income has, under the management of Mr. McEvoy, suddenly, and without any natural cause, decreased, while with proper and judicious management it should have largely increased. Secondly, that the income has been largely consumed by extraordinary charges and wasteful extravagance. Thirdly, that the guardian has not been able for a long time, either mentally or physically, to perform his duties as guardian by reason of nervous prostration, which necessitated his absence, so that he neglected the storage warehouses to the detriment of that business. Fourthly, that he has allowed the taxes to accumulate and has refused to see and converse with the petitioner, unless in the presence of his counsel; and fifthly, that it will be ruinous to the estate of his ward if he is not promptly removed. The first, second and fifth of these averments are explicitly and emphatically denied in the guardian's answer. In reply to the third charge he admits that the past condi-

tion of his health has been bad, but he insists that it is now fully restored and that he is devoting his whole time to the management of the ward's estate and property. He admits that taxes have accumulated, but he assigned as a reason therefor that the funds in his hands had been applied to other purposes, as shown in his accounts, and he explains how and why the business of the storage warehouses has deteriorated.

The power to appoint and to remove guardians is by the Code of Maryland, as we have seen, vested in the Orphans' Courts. With the provisions relating to the appointment of guardians and with some particular sections prescribing specific grounds for removal we are not now concerned. The 232d sec. of Art. 93 of the Code, as amended by the Act of 1890, ch. 425, is the enactment under which the pending proceedings were inaugurated; and unless the evidence makes out a case falling within the terms of that statute there is no reason to disturb the order appealed from. The section as it now stands reads as follows : " The Court may on the application of any infant, or any one in his behalf suggesting improper conduct in any guardian whatever, either in relation to the care and management of the property or person of the infant, or physical or mental incapacity of the guardian to properly fulfill his duties and the purposes of the office, or any other matter or thing whereby it appears that the guardian is or has become unable to bestow such direct, personal care and supervision over the person or estate of his ward as is requisite to the proper discharge of the duties of guardianship, inquire into the same, and at its discretion remove such guardian and make choice of another, who shall give security and conduct himself in the manner herein prescribed, and shall receive the property and custody of the said ward." This section does not confer a power that can be exercised arbitrarily, or without reference to the existence of some cause supported by sufficient proof; but it gives a Court of confessedly limited jurisdiction authority, upon any ground embraced in the

scope of the statute's language, to displace a fiduciary of its own appointment. To justify such a step some cause must exist, and if the assigned cause be inadequate, or, being adequate be unsustained by evidence, the power of removal cannot be lawfully called into action. As Mr. McEvoy is only guardian of the infant's estate and not of her person, the averments of the petition and the evidence adduced were confined to alleged mismanagement of the property, and to alleged mental and physical incapacity; and the assigned causes are all ultimately resolvable to mere questions of controverted fact.

It is undoubtedly true that there has been a reduction in the amount of the ward's income, and it is also apparent that some part of the *corpus* of her estate has been expended by the guardian; but we find nothing in the record to justify the charge of wasteful extravagance, whilst there is abundant evidence to explain how, without fault of his, the income diminished in consequence of supervening causes for the existence and influence of which he was in no way responsible. It ought to be noted, too, that there is not the slightest imputation against the personal integrity of Mr. McEvoy—the intent to impeach his honesty has been explicitly and unequivocally disclaimed.

The income of the ward consists of ground rents and other rents from real estate, the interest and dividends on bonds and other securities, and the profits from the storage warehouse business. During Mr. Graham's lifetime this business was, as we have said, a new and profitable one; so much so, in fact, that he began (and at the time of his death had partially completed) the construction of a second warehouse in another part of Baltimore City. After Mr. Graham's decease Mr. McEvoy was directed (and under all the circumstances, wisely directed) by the Orphans' Court to continue the storage business, and it became necessary for him, therefore, to complete the unfinished structure that it might be profitably used; and this involved a considerable outlay of money. Competition began to spring up, and the

rates of insurance on stored goods were so enormously ad-
vanced by the underwriters that the business carried on at
the original or first warehouse greatly shrank in volume,
and the receipts perceptibly decreased until they were scarcely
sufficient to pay the ground rent and the insurance on the
building, and the ordinary and necessary running expenses.
The large sums expended in completing the second ware-
house required the sale of some securities and the conse-
quent loss of income from them. These and kindred cir-
cumstances, without pausing to go into a weary detail of
figures, fully explain a decrease in the ward's income, and
they show no reason to question the carefulness or the
fidelity of the management of the estate by the guardian.
Since the decrease in the volume of storage Mr. McEvoy
has largely cut down the expenses of conducting the ware-
house, including in the retrenchment an abatement of one
thousand dollars of his own salary.

The guardian received from himself as administrator of
Mr. Graham's estate the sum of $186,221.60. He received
for his ward a legacy of five thousand dollars from Mr.
George S. Brown's estate, and by way of a stock dividend
from the Atlantic Coast Line, the sum of eighteen hundred
dollars. He also received for his ward from a mortgage
which he placed on her property $5,161.83. These sums
made a total of $198,183.43 of capital that went into his
hands. In his fifth guardianship account filed in the Or-
phans' Court, he shows, as still in his hands, $185,635.33,
which being deducted from the $198,183.43 leaves an ap-
parent shrinkage in the *corpus* of $12,548.10 ; but from this
must be subtracted two-thirds of sundry bills due by Mr.
Graham's estate and actually paid out of it, but inadvert-
ently omitted to be charged up in the administration account;
whereby the balance in the hands of the administrator and
accounted for by him to the guardian, was made to appear
just that much greater than it really was in fact. The two-
thirds to be deducted amount to $3,827.26. Taking that
from the $12,548.10 leaves an actual invasion of the *corpus*

to the extent of $8,720.84. But it is strenuously insisted that this method of ascertaining the condition of the estate is wholly erroneous. It is claimed that there is improperly included in the apparent assets the sum of $17,422.98 expended in the completion of the warehouse on Park and Dolphin streets, and in making permanent improvements to that and other property of the infant; and it is urged that the infant has been maintained out of the *corpus* of the estate instead of from the income. The calculation by which this latter charge is sought to be made good is ingenious but inaccurate. The total amount of the income is brought together and foots up $86,018.50; then the disbursements, *other than the ward's maintenance,* are summed up and money borrowed on a mortgage, executed pursuant to an order of the Orphans' Court, is added as an *expenditure* though not included in the total of *receipts* on the other side of the account as it should have been—for it was both received and paid out and the total is made to aggregate $87,261.29; thus showing an excess of expenditures over receipts of about $1,200; without including any of the twenty-nine thousand dollars paid by the guardian to the mother of the infant for the infant's support. But this is an entirely arbitrary mode of stating the amount of income and expenditures. Why should the twenty-nine thousand paid out for the ward be any more a part of the *corpus* of the estate than the sums paid for repairs and expenses? Or why should the funds paid for maintenance be treated as any less paid out of the income than were the amounts expended for repairs and permanent improvements? Now, if the sum of $87,261.29 of receipts be augmented by the addition of the proceeds of the mortgage loan, it will be swelled to $91,180.33; and if the expenditures be made to include the twenty-nine thousand dollars paid for the support of the child, the total of $87,261.29 will be increased to $116,261.29, or $25,180.96 more than the income; and if from this be taken the items expended in completing the warehouse and making permanent improvements—aggre-

gating, as stated, $17,422.98—there will be a deficit of $7,757.98, with a mortgage lien of $5,161.83, upon part of the *corpus.* For repairs and extraordinary payments, as they are called in the summary now being discussed, there were expended $70,578.19. Now, why should this sum all be charged against the *income* rather than the reverse method of making the entries? It is obvious that the process by which it is attempted to show that the child has been supported out of her capital is purely arbitrary. We have carefully and patiently gone through all of the numerous accounts in the record, and we are entirely satisfied that the true amount of deficiency in the *corpus* is $8,720.84, unless the item of $17,422.98 claimed to represent expenditures for permanent improvements has been improperly treated as forming part of the value of the *corpus.* It is clear that it was necessary to complete the warehouse which was unfinished when Mr. Graham died, and the expenditure of large sums to make the needed additions caused an invasion of the *corpus.* The securities sold to realize the necessary funds were, with possibly the exception of six thousand dollars in bonds, sold by the guardian under orders of the Orphans' Court. As taking the place of the securities so sold it was entirely proper for the guardian to charge himself with this sum of $17,422.98, representing as it did part of the *corpus* of the estate ; and he rightly so entered it in his fifth account.

During nearly the whole period of the guardianship and up to within a brief time before these proceedings were begun the guardian paid to the child's mother for the child's maintenance the sum of six thousand dollars a year, aggregating twenty-nine thousand dollars. It is highly probable that the condition of the estate did not warrant so large an allowance, especially for a child of her tender years ; and doubtless this considerable outlay contributed something to produce the deficit to which we have alluded. It was a mistake on the part of Mr. McEvoy to fix and to pay so large an allowance for the infant, but he has promptly

corrected that error by reducing the sum one-half. With the estimated income for the current year approximating ten thousand five hundred dollars it will be no difficult task to speedily restore the impaired capital.

That there were other mistakes into which Mr. McEvoy fell in the statement of the several guardian accounts which preceded the last one, is true ; but they were not errors resulting from incompetency, and far less from dishonesty. They have all been corrected in the fifth count.

With respect to the bonds amounting to six thousand ·dollars and which were sold by the guardian without, it is asserted, an order of the Orphans' Court directing a sale ; it is only necessary to say that though sec. 173 of Art. 93 of the Code (as amended by the Act of 1892, ch. 100), forbids a guardian to make sale of his ward's property unless authorized by an order of Court, and denounces any sale as void, if made without such an order, and further provides that the Orphans' Court *may* remove the guardian for making sale of the ward's property without authority ; still Mr. McEvoy evidently acted under the *bona fide* belief that he had been given permission to make the sale of these bonds. He has not been guilty of a willful and deliberate violation of the statute ; and as his official bond is amply sufficient to protect the estate he can be required to make good whatever amount he may properly be chargeable with by reason of this mistake—if mistake there was. No loss can possibly happen to the infant in consequence of this alleged oversight of the guardian. Clearly this circumstance of a failure to procure an order for the sale of these bonds, when he honestly believed he already had the authority from the Court, ought·to constitute no ground for his removal ; especially as no injury has been or can be done to the estate that the guardian's bond does not furnish a complete indemnity for.

Whilst it it is undoubtedly the duty of every fiduciary to keep down the taxes on the estate in his charge, his failure to do so under all the surroundings and in view of the large

sums of money he paid out for the use of the ward, should not, in our opinion, be treated as a sufficient ground to displace Mr. McEvoy.

It is unquestionably true that for a portion of the years eighteen hundred and ninety-five and ninety-six Mr. McEvoy was seriously ill. He was compelled to visit Europe and health resorts in this country in efforts to regain his strength ; but during his absence the warehouses (which alone of all the estate required constant attention) were carried on by the same employees who had conducted the business for Mr. Graham in his lifetime ; and there is not the faintest gleam of evidence to show that their management was not strictly and faithfully in the interest of the owners of the property. There is nothing to indicate that Mr. McEvoy's absence caused the slightest decline in the business or occasioned the loss of a single dollar to the estate. To remove him merely because in seeking to regain his health, he was absent some months, would involve the assumption, without evidence that that absence had been, of itself, productive of injury. His health is now, and before these proceedings were begun had been, entirely restored ; and he devotes his whole time and attention to the discharge of the duties pertaining to the trust. If he were displaced at this time, not because he is *now* physically or mentally incapable of attending to his ward's interests— but because for a short space of time heretofore he *had been* so incapacitated—such a proceeding would not be within the letter or the spirit of the statute. Is he *now* capable ? *Was* he capable when the petition was filed against him ? There is not a syllable uttered by any witness in the cause that questions his mental and physical ability to attend to the business *now*.

If strained relations have arisen and exist between Mrs. Macgill and Mr. McEvoy the ward's property interests, as was well said by the Court below, "will at least not suffer detriment from a severely critical attitude towards the management."

The guardian had confessedly made some mistakes ; but they are not of such a character as to indicate incapacity, indifference to the duties assumed by him, or dishonesty. The mistakes have been corrected.    Upon a review of the whole record, and taking into consideration the fact that Mr. McEvoy had been the trusted and confidential clerk of the infant's father for eight years, and that he had been selected for the position which he held under Mr. Graham by Mr. Graham's father, who knew him as a bookkeeper in the large banking house of Alexander Brown & Sons for many years, we fail to see that the Orphans' Court committed any error in refusing to remove the guardian.    If actual loss had been sustained by the estate it would of course make but little difference in so far as the practical result might be concerned, whether that loss proceeded from ignorance or dishonesty ; but when errors have been made and are not referable to a want of integrity and have been corrected or may be corrected without injury to the estate, then, there is no good reason why, for such mistakes, the guardian should be removed.

As we agree with the conclusion reached by the Orphans' Court its order will be affirmed.

*Order affirmed, with costs above and below.*

(Decided March 31st, 1897).