## ARTAMUS V. OWEN *vs.* HENRIETTA PYE.

*Orphans' Courts; guardians; removal of; discretion of Court; Code, Art. 93, sec. 236; appeal.*

Upon a petition, the Orphans' Court passed an order removing the defendant as guardian and dismissed that part of the petition which related to the appointment of H. P., the petitioner, as guardian; on the same day another order was passed appointing H. C. R. guardian. The guardian who was removed took an appeal as follows: "Enter an appeal from the judgment in this case to the Court of Appeals." *Held,* the appeal should have been more specific, but as the guardian, if properly removed, could not appeal from the appointment of the new guardian, nor from the refusal of the Court to appoint H. P., it would be assumed that the guardian appealed from the order removing him.                    p. 402

If a guardian is shown to be unfit or to neglect his duties to his ward, as regards his person or his property, the Orphans' Court should remove him, but it should not do so lightly or in the absence of evidence.                    p. 406

Notwithstanding the provisions in section 236 of Art. 93 of the Code of Public General Laws (1904), that the Orphans' Court may at its discretion remove the guardian, its action in such matters can be reviewed.                    p. 406

*Decided April 5th, 1911.*

Appeal from the Orphans' Court of Charles County.

The cause was argued before BOYD, C. J., PEARCE, THOMAS, PATTISON and URNER, JJ.

*Walter D. Mitchell* (with a brief by *Mitchell* and *Diggs*), for the appellant.

*Adrian Posey* and *F. Stone Posey,* for the appellee.

Boyd, C. J., delivered the opinion of the Court.

The appellee filed a petition in the Orphans' Court of Charles County asking the removal of the appellant as guardian of William C. Jameson, and that she be appointed in his place. She is the aunt, and the appellant is the stepfather of the infant. The appellant was appointed guardian on the 17th of March, 1908, and the petition alleges that the impelling motive that actuated the Court in appointing him was that Mrs. Laura A. Owen, the mother of the appellant, would have the personal care of the infant. It also alleges that Mrs. Laura A. Owen had departed this life and that the ward was left without that motherly care which a child of his tender years should have, but that he was not even directly under the care or in the custody of his guardian, and was residing with a person who had no legal authority over him, and cannot have any personal interest in his moral or material welfare.

The answer of the appellant alleges that he has zealously guarded the property interests of the infant and that his property consisted almost entirely of a valuable farm in Charles county, which the respondent was renting to a responsible tenant; that since his appointment he has carefully guarded the moral welfare of the infant, having visited him at regular intervals, and had him at all times under motherly environment; that in order that the said infant might have the watchful care of a mother's influence and be more convenient to school, to which he had been regularly sent, the respondent had boarded him with respondent's mother, Laura A. Owen, and that since her death he had secured the services of a reputable Christian woman to continue to look after the welfare of said infant, as he will continue to do during the period in which the infant is of tender years, and he denies that said infant has ever been without motherly care and attention, except for a few days immediately after the death of Laura A. Owen, while he was securing the services of a nurse. The answer also states that he was the second husband of the

ward's mother, and that he is the guardian of Lemuel Brent Owen, a half-brother of William C. Jameson, and that the infants are associated together by the respondent as much as the circumstances will permit. The respondent avers that the infant had at all times, under the circumstances set forth in the answer, been directly under his care and custody, and denies that he has ever been under the care of any person who has no personal interest in either his material or moral welfare.

After testimony was taken, the Orphans' Court passed an order granting the petition so far as it related to the removal of said Artamus V. Owen, and dismissing the part of it which related to the appointment of Henrietta Pye as guardian. On the same day another order was passed by which Henry C. Robertson was appointed guardian of the infant —it reciting that the letters of guardianship of the appellant had that day been revoked.

An appeal was entered as follows: "Enter an appeal from the judgment in this case to the Court of Appeals". The appellee has made a motion to dismiss the appeal on the ground that it is too general—That it cannot be told of what the appellant is complaining. Although the order for the appeal should have been more specific, yet inasmuch as the appellant cannot appeal from the appointment of a new guardian, if he has been properly removed, and, as he had no reason to complain of the Court refusing to appoint Miss Pye, it is evident that he intended his appeal to be from the order removing him, and it will be so considered. The motion to dismiss will therefore be overruled.

If it were determined by this Court that the Orphans' Court was justified in removing the appellant, under such conditions as are disclosed by this record, it would be difficult to get competent persons to accept the appointments of guardians. There is no pretense that the appellant has in any way mismanaged the estate of his ward, or that he is neglecting his education, or is not having him attend church, but the substance of the complainant is that "the impelling

motive that actuated" the Court in appointing the appellant
was that his mother would have the personal care of the
ward, and that as she is now dead the ward is left without
the motherly care and attention which a child of his age
should have. The testimony shows that it was understood
at the time of his appointment that the child, who was then
only five years of age, would be placed by the appellant at
the home of his father and mother. He was placed there,
and in less than six weeks after the death of Mrs. Owen
this petition was filed. The appellant married Mrs. Jame-
son, the mother of the ward, on November 21st, 1906, and
she died on February 20th, 1908, leaving two children,
William Claude Jameson, who was then five years and two
months old, and Lemuel Brent Owen, who was three weeks
old. Claude lived with his mother and the appellant from
the time of their marriage until her death. The appellant,
in answer to the question, "What is your personal feeling
towards your ward, Wm. C. Jameson, and what appears to
be his feeling to you?" replied: "I married his mother, and
he came with her as her son, and he is the same to me as
if my own. His feelings to me seem the same as if I was
his father. He calls me Pa". Although the appellant lives
four miles from McConchie, where his father lives, he tes-
tified, in referring to his ward, "I see him at least three
times a week, and sometimes every day". He also said he
had seen that he attended church, when there was service,
and school every school day. He attended the church which
his mother attended, and the schoolhouse was only half a
mile from the house of L. B. Owen, where the child is
living.

   After the death of the appellant's wife he employed a
colored woman to take care of his child (which it will be
remembered was only three weeks old when its mother died)
at his own home, and, in answer to the question why he
did not keep the two boys together, he said that the Court
had told him that it did not want Claude brought up by a
colored woman, as Miss Pye had complained about that, and

his mother was not able to take care of the little one. When the appellant's mother died, his father and his sister, who was about twenty-six years of age, were the only members of the family left at his father's house, and the sister afterwards went away. The appellant then endeavored to get a sister of the petitioner to go to his father's and take charge of the child, but she declined, and he got a Mrs. Turner, who is a married woman, and has two children. As Mrs. Turner did not want to be at the house without a female companion, she, with the appellant's consent, got one, and the two women are living at Mr. L. B. Owen's—the companion of Mrs. Turner doing other work about the place. Mr. L. B. Owen is the father of the appellant, and is highly spoken of by the witnesses. There is not a particle of evidence in the record suggesting that Mrs. Turner is not a suitable and competent person to have charge of Claude. It was said at the argument that the record shows she had a husband in Washington, but surely it would not be expected that this Court, or the Orphans' Court, would draw the inference from that fact that she was not a proper person to have charge of this child. It is not shown why she lived at Mr. Owen's in Charles county and her husband in Washington City, but many industrious, virtuous women have been compelled to make their own living by reason of the neglect or misfortune of their husbands, and in the absence of some evidence to that effect, it cannot be presumed that Mrs. Turner is not a suitable person to attend to the duties she is employed to perform. The fact that she wanted a female companion while living in the house of a man other than her husband is certainly not to her discredit, but on the contrary, would indicate that she had a proper appreciation of the position she occupied. Comment was also made on the statement of the appellant that if she did not prove to be a painstaking caretaker or nurse, he would get someone who would be. That was said in answer to a question asked him, and showed his willingness to do all that could be demanded of anyone, but it did not indicate that he had any

reason to doubt the fitness for the position of the one he had already empolyed.

The testimony shows that Mr. L. B. Owen and the appellant stand well in the community, and nothing is suggested against the character of either of them. The only thing which at all reflected upon either was that the appellant on one occasion, when he and Miss Edna Pye had some discussion about the treatment of him by her family, swore in her presence, but she said he apolized for that, although she told him she would never forget it, and the evidence is that he had since visited their house a number of times.

The only evidence that can be said to reflect in any way upon the appellants care of the boy is that several of the witnesses said that he did not appear to be as well kept as he was in his mother's life time, and one of the witnesses said that on one occasion his head was dirty. The circumstances related about his head and at one time not being properly clad occurred in the lifetime of the mother of the appellant, but they were of such a trivial character as rather tend to show that the appellant must have done his full duty to his ward when such things were relied on to sustain the petition. It may be that this orphan boy sometimes shows the want of a mother, for it matters not how devoted others may be, it is seldom that a true mother's place can be filled in all respects, in reference to either the physical or moral care of the child, but can it be said from the evidence in this record that the welfare of this boy requires that he should be taken from the custody of the one his mother married, with whom he lived during the rest of her life and under whose control he has since been, covering a period altogether of over four years? It must be injurious to the welfare of a boy of his age to make unnecessary changes of those who are to have control over him, and it is difficult to imagine a case presenting a greater hardship on a guardian than this, where there are no charges of bad management, or improper treatment, and where the most that can be said is that by reason of the death of the mother of the guardian, the ward can no

longer have the benefit of her supervision and care although
he is still at the house of the father of the guardian and has
the care of a woman employed for that purpose. To be
removed from such a position is not only a mortification to
any one of proper feelings, but it is liable to be misunder-
stood by the public, and without any fault of his this guar-
dian is subjected to the payment of $76.15 costs, incurred
in a Court below in the proceedings for his removal. If a
guardian is shown to be unfit for the discharge of his duties,
or if he neglects his duties to his ward in the management of
either his property or person, the Orphans' Court should not
hestitate to exercise the power vested in it, and remove him,
when the circumstances require it, but when there is not only
no evidence of such neglect, but on the contrary there is evi-
dence of determined efforts on the part of the guardian to do
all he can for the care of the ward, it should require more
than we have in this record to establish his inability to do
what is expected and required of him by law.

Such being our view of the facts and circumstances of the
case, it only remains to determine whether we can properly
reverse the action of the Orphans' Court. Notwithstanding
the provision in what is now section 236 of Article 93 of the
Code, that the Orphans' Court may on the application of
an infant or someone in his behalf, suggesting the grounds
therein stated, "inquire into the same, and, at its discretion,
remove such guardian," etc., it has been determined by this
Court in several cases that its action can be reviewed.

In *Slatterly* v. *Smiley,* 25 Md. 389, our predecessors
reversed the decree of the Orphans' Court which removed the
guardian,—holding that what is now section 60 of Article
5 of the Code authorized this Court to review the action of
the Orphans' Court, notwithstanding the language of the
other section referred to. At that time the statute only
authorized the removal of the guardian for misconduct on
his part, and since then this section (236 of Article 93)
has been made much broader, as to the grounds for removal,
but the language of the statute as to the discretion of the

Orphans' Court is not changed.    The case of *Macgill* v. *McEvoy,* 85 Md. 286, was decided after the statute was amended, as it is now in the Code.  CHIEF JUDGE MCSHERRY went thoroughly into the question of the right of this Court to review the action of the Orphans' Court, and determinted that such right existed.   After pointing out why there was no appeal from section 237 (now 241) of Article 93, he went on to say : "But the discretion conferred by sections 232 and 241 is a sound, legal discretion to be used conformably to the settled rules of law—to be exercised if the facts warrant it, to be withheld if they do not—and if erroneously exerted in either direction the determination is subject to review on appeal."    That case clearly authorizes us to review the action of the lower Court in this instance, and as we are convinced that it is not shown that "the guardian is or has become unable to bestow such direct personal care and supervision over the person or estate of his ward as is requisite to the proper discharge of the duties of guardianship," the appellant should not have been removed.   That is the only possible ground in the statute which could have given the appellee any standing in Court, and as in our judgment the facts proven did not justify the removal of the appellant on that ground, we must reverse the order appealed from.

> *Order reversed, the appellee to pay the costs.*