[No. 26718.   Department Two.   May 16, 1938.]

S. P. LEWIS, *Respondent,* v. B. F. COLEMAN, *Appellant.*[1]

[1]Reported in 79 P. (2d) 633.

*Hyland, Elvidge & Alvord* and *Monroe Watt,* for appellant.

*Allen & Wilkins* (*Charles R. Carey,* of counsel), for respondent.

ROBINSON, J.—This action was brought to recover damages for the alleged conversion of corporate stock.

In November, 1932, B. F. Coleman, defendant below, appellant here, was engaged in selling automobiles in Kent, Washington. Respondent, Lewis, was one of his salesmen.

Lewis owned 24½ of the 214 shares of non-par capital stock of the Auburn Dairy Products, Inc., which had been operating a creamery at Auburn since 1923, and had pledged the certificate to secure a note to a Renton bank. The note was overdue, and immediate payment of $475.88 had been demanded. He went to his employer for help.

From this point on, there is much dispute in the evidence. Lewis testified that Coleman was very eager to aid in the matter. Coleman said he did so with great reluctance, and only after much pleading and urging. At all events, after discussing the matter with the bank, Coleman furnished $187.17 and took on a liability to pay the balance of three hundred dollars in one hundred dollar installments. He was compelled to discharge the liability and, upon making the final payment, took up the papers, including the stock certificate and the stock power.

Coleman sold the stock to the corporation on May 8, 1933, for $618, which was the amount he had paid out for the benefit of Lewis, plus some other small

sums which Lewis owed him. Lewis testified to things which, if true, tended to prove that this sale constituted a conversion, and Coleman testified to circumstances which indicated it to be a justifiable foreclosure of pledge. The jury evidently believed Lewis, for it gave him a verdict for $2,125.

Coleman contends that the action should have been dismissed on his trial motions, that he should have had judgment notwithstanding the verdict, and that, at the very least, he was entitled to a new trial. He asks, in the alternative, for the same relief in this court. As to his prayer for judgment notwithstanding the verdict, we have concluded, for reasons hereinafter stated, to give his adversary the benefit of the doubt, but a new trial must be granted.

In instruction No. 6, the jury was told, in substance, that Lewis would be entitled to recover if Coleman converted his stock and its value exceeded the amount of the debt secured, and in instruction No. 10, that, if Coleman sold the stock without notice and contrary to the pledge agreement, such act would constitute a conversion of the stock and render Coleman liable to Lewis for its value at the time of the conversion, less the value of the loan, with interest.

In instruction No. 14, the court laid down the following rule for the guidance of the jury in valuing the stock:

"Where stock in a corporation is not listed, and no market value can be ascertained, its value is determined by the worth of the company. This worth is the difference, of course, between its assets and liabilities. *So, if you find for the plaintiff, to ascertain the value of the stock, you should take the assets of the company, from which you should deduct its liabilities. Then to this difference, if it is a surplus, you should add the amount of paid-in or paid-up capital and divide the amount so ascertained by the number of shares of stock outstanding and this will give you*

*the actual value of each share. Then multiply by the number of shares in question and that will be the total value."* (Italics ours.)

There had been introduced in evidence, over violent objection, certain financial statements and bookkeeping records purporting to show the worth of the company. These were produced by Bryan, secretary and treasurer of the company, who had kept its books for many years. Most of these records, though not all of them, had been prepared and compiled by him from time to time in the course of his work. Plaintiff offered a balance sheet of the dairy company, dated June 30, 1932, about a year prior to the alleged conversion. Bryan could not remember definitely that he made it out, but thought that he did. Upon vigorous objection being made to its admission, the court inquired:

"Mr. Bryan, I am going to ask you whether or not this plaintiff's exhibit '10' for identification shows the corporate assets and liabilities of your company as of June, 1932? A. That is what it is supposed to show. THE COURT: It may be admitted in evidence and marked '10' over objection."

This exhibit showed a surplus of $14,240.43 and a paid-up capital of $14,400, that is to say, a net worth of $28,640.43. Plaintiff's exhibit "12" was a financial statement prepared by Bryan for banking purposes, showing a surplus as of December 31, 1932, of $12,967.83, which, plus the paid-up capital stock of $14,400, showed a net worth, as of that date, of $27,367.83. Plaintiff's exhibits "19," "20" and "21" consist of monthly statements prepared by Bryan during the years 1932, 1933 and 1934. We shall not detail these amounts. The monthly statement nearest to the time of the alleged conversion is that of April 30, 1933. This shows a surplus of $12,907.38, or a net worth of $27,307.38. Coleman sold the stock nine days later.

Plaintiff's exhibit "11" is an auditor's report pur-

porting to have been made by Racine & Co. It contains general comments on the financial condition of the corporation, followed by a profit and loss statement for the year ending December 31, 1933, and a balance sheet. It recites that these statements were prepared without a complete audit of the books, but are believed to be "substantially correct." The balance sheet shows a surplus of $8,943.44 on December 31, 1933, and a net worth of $23,343.44.

The sudden shrinkage of surplus from $12,907.38 on April 30, 1933, to $8,943.44 on December 31, 1933, is accounted for in the following manner: When Racine & Co. made the audit in December, 1933, it found that the corporation had taken no depreciation on its milk cans, dairy machinery, and other equipment, since 1925, and thereupon proceeded to adjust the matter by writing off $4,833.45. It must follow, of course, that the net worth shown at the date nearest the alleged conversion, April 30, 1933, is deceptive, for it includes the value of dairy equipment as of 1925, some of which had, by April, 1933, been in use for eight years.

This, however, is not of much importance, for it is demonstrably plain that the members of the jury, in making the computation directed by instruction No. 14, must have used the smallest surplus given in all the testimony bearing upon the matter, that is, the surplus remaining after depreciation taken in the Racine & Co. audit. Indeed, they either slightly discounted it or made some mistake in computation, for, applying the rigid mathematical formula made mandatory by instruction No. 14, that surplus, $8,943.44, plus the paid-in capital, $14,400, divided by the number of shares outstanding, 214, multiplied by the number of shares alleged to have been converted, 24½, less the amount admittedly owing from Lewis to Coleman,

$618, should have resulted in a verdict for $2,163.56; whereas the verdict was for slightly less than that.

The record shows that, after deliberating upon the matter for some time, the jury sent out to the trial judge the following note:

"Refer Instr. No. 14.

"Since the stock was listed [unlisted], are we permitted to consider the testimony as ascertaining the value of the stock, or must we take the book value for the company worth.  R. T. STRONG."

To this inquiry, the trial judge replied that no further instruction would be given.

It is not strange that the members of the jury were somewhat puzzled by instruction No. 14. They must be deemed to have known, as everyone else does, that a minority stockholder cannot lift out of a corporation his aliquot share of its assets or demand and receive from it the money value thereof. The only thing the owner of a minority interest in a going concern can do, as is said in the recent case of *Hotchkiss v. Fischer,* 139 Kan. 333, 31 P. (2d) 37, is "to sell it or keep it and take his chance on dividends."

The jury had heard during the trial a great deal of evidence, much of it undisputed, from which an inference could be made that no reasonable purchaser would pay book value for the stock, evidence such as the following: That, at the time of the alleged conversion, the corporation had been operating for ten years and had never paid a dividend; that it had paid none up to the time of the trial; that all of its stock, except that owned by Lewis, was, and from the beginning had been, in the hands of four men, two of whom were brothers; that all four of these men were officers of the company, and that they also worked for the company as employees on regular salaries; that it had been their custom, when the corporation accu-

mulated a little money which it did not need as operating capital, to pay it out to themselves in the guise of officers' salaries. They had also heard evidence that Lewis offered to sell his stock to one of the other stockholders for fifteen hundred dollars, and later for twelve hundred dollars; that early in 1933, he offered to sell the stock to another stockholder for one thousand dollars. All of such evidence was excluded from the consideration of the jury by instruction No. 14. We think this was error.

In the absence of proof of market value, evidence of book value or net worth may be given, but it is only one of the elements of proof. After all, the only purpose in determining the value is to get at the sum which could probably be realized on sale of the stock, for the price at which it could be sold is all that the owner of minority stock is deprived of by its conversion and constitutes the measure of his damage. In a case where damages were sought for conversion of stock, a Minnesota trial judge wound up his instructions as to damages with the following statement:

" 'I know of no better rule for you to adopt, if you get that far in the case, than to ascertain and determine from the evidence what a person who wanted to buy stock in this corporation would reasonably expect to pay for this block of 220 shares.' " *Hawkins v. Mellis, Pirie & Co.*, 127 Minn. 393, 149 N. W. 663, 1916C, 640.

In affirming the case on appeal, the appellate court said, in part:

"When stock in a corporation has not figured in the markets, and there have been no sales or dealings therein, its actual value must be determined at the fair price which a person who desires to buy would be willing to pay, taking into consideration the original capital, how far there has been profit or loss in the business carried on, the assets and liabilities, the future

prospects, and everything that goes to affect the value of the shares of stock."

The rule is a little more fully stated in *Moffitt v. Hereford,* 132 Mo. 513, 34 S. W. 252:

"When one is to be charged for the value of stock the market value should be taken if it can be ascertained. This is determined by sales in the market at or about the time. . . .

"If the stock has no ascertainable market value then the actual or intrinsic value must be taken as the basis. This value may depend on many facts and circumstances, such as the value of the property and assets owned; the dividends paid; the character and pernancy of the business; the control of the stock; the management; the markets for articles produced, if a manufacturing concern, and other facts. The evidence would necessarily take a broad range and would properly be admissible to prove any fact calculated to affect the value."

The rule is stated in almost the same language in 22 C. J. 186. See, also, *Hotchkiss v. Fischer, supra,* and on the general proposition that book value is not conclusive, see *Ray Consolidated Copper Co. v. United States,* 268 U. S. 373, 69 L. Ed. 1003, 45 S. Ct. 526; *Virginia v. West Virginia,* 238 U. S. 202, 59 L. Ed. 1272, 35 S. Ct. 795; *Jarvis v. Bell,* 296 Pa. 568, 146 Atl. 153.

At the time appellant's counsel took his exceptions to the instructions, the court refused to modify instruction No. 14, on the ground that it correctly stated the rule employed by the trial court, and later approved by this court, in the case of *Hetrick v. Smith,* 67 Wash. 664, 122 Pac. 363. Respondent contends that this case is exactly like the *Hetrick* case, and says that instruction No. 14 must be approved or that case must be overruled. In the *Hetrick* case, as in this, the plaintiff sued to recover damages for the conversion of corporate stock. In that case, the method of arriving at her damages was the exact method directed by the court

in its instructions 6, 8 and 14, and this court squarely approved the method and affirmed the judgment.

.,The cases are readily distinguishable. In the *Hetrick* case, the plaintiff owned one hundred per cent of the corporate stock. Since she owned every share of the corporation's stock, she had complete ownership of its assets and the right and power to immediately turn them into cash. When the defendant converted ninety-nine per cent of the stock by transferring it to innocent purchasers, he deprived her of that right and, therefore, of the actual value of the assets. Or; to put it in another way, her loss was exactly the same as it would have been had she individually owned the assets and he had converted them, that is, the value of the assets. In this case, the ownership of about eleven per cent of the stock gave Lewis no right whatever to sell the assets or any part thereof. He could turn his interest into cash only by selling his stock. The measure of his loss, by reason of the conversion, was the sum for which, in view of all the circumstances, the stock could have been sold.

The Racine & Co. report was erroneously admitted in evidence. It performed all the functions of a witness, and a very material one, since it purported, by its own weight, to prove the financial condition of the company during 1933, the year in which the conversion is alleged to have taken place. Yet, being an inanimate thing, it could neither take an oath nor be cross-examined.

The foundation for the admission of some of the other financial statements was, at least, very unsubstantial. It is true that Bryan testified that they were compiled from the books. However, neither he nor anyone else testified that the items of property listed in the books were correctly valued. As against Coleman, the correctness of the values written in the books

could scarcely be presumed. *In re Porter's Will*, 178 Wis. 556, 190 N. W. 473.

■ The appellant based his argument for judgment notwithstanding the verdict, and now asks that the case be dismissed, upon the contention that, if the inadmissible evidence be disregarded, he is entitled to judgment as a matter of law. The evidence which would be thus excised relates wholly to the book value of the corporate stock. As we have seen, book value is not alone determinative, and, therefore, failure to prove it with accuracy was not necessarily fatal to the plaintiff's case.

There is other evidence in the record, particularly in the more than two hundred pages reciting the oral testimony given by the witness Bryan, from which reasonable inferences as to value may be drawn. We cannot say, as a matter of law, that there was not sufficient competent evidence in the record to warrant the jury in finding that the stock in question was worth more than $618.

The judgment appealed from is reversed, and the trial court is directed to grant the appellant's motion for a new trial.

Beals, Blake, and Millard, JJ., concur.

Steinert, C. J., dissents.