[No. 893-2.    Division Two.    November 8, 1973.]

JAN C. GARRETSON, *Respondent*, v. RED-CO, INC., *et al.*, *Appellants*.

*Hal D. Murtland,* for appellants.

*Thomas R. Dreiling* and *David D. Hoff* (of *Thom, Mussehl, Navoni, Hoff & Pierson*), for respondent.

PEARSON, C.J.—Defendants appeal from a judgment for damages and attorney's fees in an action brought by plaintiff, Jan Garretson, under RCW 21.20.430, the civil liability provision of The Securities Act of Washington.

The assignments of error relate to a single issue. On the evidence presented did the trial court properly apply the damage formula set forth in RCW 21.20.430?[1] We affirm the judgment.

---

[1] RCW 21.20.430(1) provides: "Any person, who offers or sells a security in violation of any provisions of RCW 21.20.140 through

The unchallenged findings establish that in 1969 plaintiff purchased 250 shares of stock in Pacific Avenue Investments, Inc. for $25,745.36. The sale was initiated and solicited by the defendant, Red-Co, Inc., a Washington corporation. The securities were not registered or filed under either the United States Securities Exchange Act or The Securities Act of Washington (RCW 21.20 *et seq.*), nor were they exempt from registration. This failure to register was a violation of RCW 21.20.140 and rendered Red-Co, together with its "controlling persons," liable in damages to the purchaser (plaintiff). RCW 21.20.430 (1) and (2).

The defendants, Clint E. Marshall and Robert Balmer, were found to be "controlling persons" of Red-Co, Inc. Defendants O'Toole were not found to be "controlling persons," the judgment does not affect them, and they are not parties to the appeal.[2]

The trial court allowed damages of $11,345.36, together with the statutory interest. This amount represented the difference between plaintiff's acquisition cost ($25,745.36) and the price he received ($14,400) when he sold his shares in February 1971, to one Earl Solie, then president of Pacific Avenue Investments, Inc.

The thrust of defendants' contention is that the sale by plaintiff to Earl Solie and several other sales[3] which had been consummated between other shareholders of Pacific

21.20.230, or offers or sells a security by means of fraud or misrepresentation is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less (a) the value of the security when the buyer disposed of it and (b) interest at six percent per annum from the date of disposition."

[2] We do not find a specific order dismissing plaintiff's complaint against defendants Martin O'Toole and wife.

[3] It is not contended that these sales also were in violation of RCW 21.20.140 and we do not pass upon that question.

did not, under the circumstance then existing, represent the fair market value of the stock within the meaning of *value* as it is used in RCW 21.20.430(1).

This contention is largely premised upon the fact that Pacific was a closely held corporation created to develop a tract of real property which it owned, which property did have an ascertainable value. It is also premised upon finding of fact No. 9, which concerned the time frame during which the resales occurred. That finding provides:

> At the time of the sale of Plaintiff's stock to Earl Solie, and within several months preceding the sale and several months thereafter there was a severely depressed economic condition in the Tacoma area wherein the real property which was the sole asset of Pacific Avenue Investments, Inc. was located. In addition, during this period of time the stockholders were assessed additional sums to pay the carrying charges and other expenses of the property. As a result, many stockholders were attempting to sell their stock and it was very difficult to do so. *There was practically no market for the shares with outside parties and the only market that did exist was within the Corporate structure with those shareholders already involved who were so deeply committed that they felt they could not withdraw and had continued faith in the enterprise and continued capital to support that enterprise.*

(Italics ours.)

Defendants contend that instead of using these kinds of sales as a basis of value, the trial court should have used the uncontroverted "worth of the corporate assets," in which case no loss in "value" was shown.

Defendants rely upon decisions from other jurisdictions in support of this contention. For the most part, those decisions involved common-law actions for damages by a defrauded purchaser of stock. In some of the cases a "worth of the assets" test of value was sanctioned where there was no market available by which to establish value. *Albert v. Black Motor Co.*, 357 S.W.2d 714 (Ky. 1962); *Trebelhorn v. Bartlett*, 154 Neb. 113, 47 N.W.2d 374 (1951); *Armstrong v. Rachow*, 205 Mich. 168, 171 N.W. 389 (1919). At least one

jurisdiction required use of a "worth of the assets" standard, even though a market existed. *Zinn v. Ex-Cell-O Corp.*, 24 Cal. 2d 290, 149 P.2d 177 (1944); *Kendrick v. Schwartz*, 69 Cal. App. 2d 171, 158 P.2d 405 (1945). Washington has not addressed this issue in a stock fraud case, either before or after enactment of the securities act in 1959.

We also point out by way of background, that various jurisdictions have been widely divergent in stock fraud cases on what the proper measure of damages should be. The principal conflict was between those courts following a "benefit of the bargain" standard and those following an "out-of-pocket" standard. A discussion of those theories appears in *Strickland v. Muir*, 198 So. 2d 49 (Fla. App. 1967); *Tilghman v. Dollenberg*, 418 Pa. 604, 213 A.2d 324 (1965); 108 A.L.R. 1060 (1937).

The measure of damages under the "benefit of the bargain" standard (also called the contract rule) was the difference between the true and actual value of the stocks and their value had the facts been as represented. *See Strickland v. Muir, supra.*

The measure of damages under the "out-of-pocket" standard (also called the tort rule) allowed the recovery of the defrauded purchaser's actual loss. This was measured by the difference between the acquisition or contract price and the real or actual value at the date of the sale. *See Tilghman v. Dollenberg, supra.*

Another common-law conflict related to the time frame used for ascertaining the value of stock for the purpose of measuring damages. Some jurisdictions would fix damages as of the time of the original acquisition, while others would fix damages at the time the fraud was discovered. 108 A.L.R. 1060 (1937).

While not having entered this controversy in a stock fraud suit, the Supreme Court has dealt with these questions in cases involving actions for conversion of stock and in one case involving a fraudulent commercial transaction. *Hetrick v. Smith*, 67 Wash. 664, 122 P. 363 (1912) (stock

conversion); *Lewis v. Coleman,* 194 Wash. 674, 79 P.2d 633 (1938) (stock conversion); *Hoke v. Stevens-Norton, Inc.,* 60 Wn.2d 775, 375 P.2d 743 (1962) (fraudulent commercial transaction).

*Hoke v. Stevens-Norton, Inc., supra,* involved the sale of a promissory note under a false representation that the note was secured by a second mortgage on real property. In passing on the proper measure of damages, the Supreme Court indicated its preference for the "benefit of the bargain" standard and measured the damages by the difference between the value of the security had the value been as represented and the actual or real value of the security received. The court also commented at page 780 that the "pertinent values . . . are to be determined either as of the time of acquisition or discovery of the fraud."

The only definitive ruling on the method of arriving at the value of stock in a stock conversion suit appears in *Lewis v. Coleman, supra* at 681:

> The rule is a little more fully stated in *Moffitt v. Hereford,* 132 Mo. 513, 34 S.W. 252:
>
> "When one is to be charged for the value of stock the market value should be taken if it can be ascertained. *This is determined by sales in the market at or about the time.* . . .
>
> "If the stock has no ascertainable market value then the actual or intrinsic value must be taken as the basis. This value may depend on many facts and circumstances, such as the value of the property and assets owned; the dividends paid; the character and pernancy of the business; the control of the stock; the management; the markets for articles produced, if a manufacturing concern, and other facts. The evidence would necessarily take a broad range and would properly be admissible to prove any fact calculated to affect the value."

(Italics ours.)

■ With this background in mind, we now turn to the controlling statute, RCW 21.20.430(1). We recognize that our primary function is to carry out the legislative purpose of the act, utilizing such principles of the common law as may be useful in ascertaining and implementing that pur-

pose. We conclude that statute drastically alters the common-law concepts. Our reasons are as follows.

■ First, the act limits a seller's liability to a purchaser to the amount of consideration (plus interest) paid by the purchaser when he acquires the stock. This is true whether the purchaser still has the stock and seeks to rescind the sale, or whether he has disposed of the stock, as was true of plaintiff in the case at bench. *See* footnote 1.

This appears to us to be a rejection of the "benefit of the bargain" measure of damages. Instead, the act seeks to reimburse a purchaser for his actual out-of-pocket loss where he has been defrauded or the victim of an illegal sale.

Second, there is no liability for an illegal or fraudulent sale under this statute where the buyer chooses to retain the stock—another indication that a "benefit of the bargain" standard is not contemplated.

Third, a buyer who has disposed of his stock within 3 years of the time he acquires it is entitled to:

Damages are the amount that would be recoverable upon a tender [consideration paid for the security] less (a) the *value* of the security when the buyer disposed of it and (b) interest at six percent per annum from the date of disposition.

(Italics ours.) RCW 21.20.430 (1).

This formula then allows no more than the *consideration* originally paid less the *value* at the time of resale, thus fixing both the limit and the time for measuring the damages and again evincing a purpose of allowing compensatory or out-of-pocket damages.

This statement of the legislative purpose is buttressed by subsection (3) of RCW 21.20.430. According to that provision, a seller of securities in violation of the act (or who sells fraudulently) may avoid suit under certain circumstances by making a pre-suit offer to refund the consideration originally paid to either (a) a purchaser who still holds the stock, or (b) a purchaser who has previously disposed of the stock.

We conclude that the thrust of this "buyer-protection" law is to afford compensation to a purchaser for any actual loss occasioned by the fraudulent or illegal sale. That being its purpose, we turn to the pivotal question: What is meant by "value of the security" in the damage provision?

■ Our conclusion is that "value of the security" in RCW 21.20.430(1) means the actual price which the purchaser receives for the resale of the stock, and the measure of his damage is the difference between the acquisition price and the resale price.

This concept of value will best carry out the compensatory thrust of the act and avoid an injustice where the corporate assets or some other standard may demonstrate a per share value in excess of that realized by the purchaser who is able to dispose of his shares.

In suits under RCW 21.20.430(1) there will be no occasion to go beyond the resale price in arriving at the "value of the security." As stated above, where the purchaser owns the stock and tenders it to those responsible for selling it to him, he is entitled to receive back the price he paid (plus interest) for the stock. When he elects to retain the stock, he is denied a remedy. When he resells the stock, the price he receives will establish the existence of a market for the purpose of fixing his damages.

Defendant contends, however, that an injustice may occur if this concept of value is used, where a purchaser disposes of his stock for a grossly inadequate price. We do not consider this argument persuasive. The "controlling persons" are given a method of limiting their liability to the amount of consideration (plus interest) received by them. They may do this by making a written offer before suit to refund the consideration (plus interest) to a purchaser who still owns the stock. The purchaser must accept the offer within 30 days or he is denied the right to sue. RCW 21.20.430(3). That is all the protection to which the seller is entitled under the statute.

We conclude that the trial court applied the proper damage formula and that judgment should be affirmed. The

case is remanded to the trial court for determination of a reasonable attorney's fee on appeal, in accordance with RCW 21.20.430.

PETRIE and ARMSTRONG, JJ., concur.