No. 25,331.

Allan E. Mercer, *Appellee,* v. Fred Harvey, a Corporation, *Appellant.*

SYLLABUS BY THE COURT.

Damages—*False Arrest and Imprisonment—Liability of Corporation for Unauthorized Acts of Subordinate Agent.* A corporation is not liable in damages for the wrongful act of a subordinate agent in causing an arrest for larceny of property which was not under the care of such agent, unless it is shown that such act was previously authorized or later ratified by some official or agent of the corporation having authority to do so.

Appeal from Wyandotte district court, division No. 1; Edward L. Fischer judge. Opinion filed June 7, 1924. Reversed.

*A. L. Berger,* of Kansas City, *Wm. Paul Pinkerton, Sam B. Sebree, Henry L. Jost,* and *Frank P. Sebree,* all of Kansas City, Mo., for the appellant.

*J. K. Cubbison, William G. Holt,* and *J. K. Cubbison, jr.,* all of Kansas City, for the appellee.

The opinion of the court was delivered by

Harvey, J.: This is an action for damages for false arrest and imprisonment. There was a verdict and judgment for plaintiff. The defendant appeals and contends that its demurrer to the evidence should have been sustained; that a new trial should have been granted, and that the amount of the judgment is excessive.

The facts giving rise to the controversy are in substance as follows: The defendant operates dining cars on the Frisco and other railroads leading out of Kansas City. The plaintiff, Mercer, was a waiter on one of defendant's dining cars operated from Kansas City to Fort Scott over the Frisco. The car was in charge of a steward,

Mr. Gibbons. The car left Kansas City about five o'clock in the afternoon, went to Fort Scott, remained there overnight and returned to Kansas City the next morning, reaching there about noon. On March 11, 1922, the cash box containing about $33 was stolen from the car. It had been taken out of the refrigerator, where the steward had placed it when the car reached Kansas City about noon, and its loss was discovered when he was getting ready to go out on the run that evening. Gibbons reported this loss to Mr. Ray, who was the assistant purchasing agent for defendant. The next day Ray had a conversation with Mr. McCaffrey, the car foreman of the Frisco, who told Ray that soon after noon on the day the box of cash was missing he met Mercer crossing the tracks in the yards with a cash box under his arm; that the cash box was one from the defendant's dining car. McCaffrey also reported this matter to the special agent of the Frisco. Some one asked the police department to investigate the loss, and on March 14 two plain-clothes men of the police department, Fagan and Hastings, were sent to investigate it, and were told to see Mr. Ray, whom they found at the defendant's office at the union station. Ray told the officers about having a waiter who had stolen some money and wanted them to go down to the car and wait until he came and question him. The officers and Ray went to the car and waited until the plaintiff came to go out on his run. What there took place was told by plaintiff as follows:

"When I came to the car that evening about twenty-five minutes of five, . . . I passed four men at the table, and I had never seen them before in the whole eighteen months I had been on the car. And when I passed in I heard Mr. Ray's voice say, 'There is Mercer; that is the man; arrest him.' And the officer jumped up and pulled me down to the locker, and said, 'What do you want here?' and I said, 'My clothes'; and he said, 'You need not be in no hurry to change your clothes because you are under arrest,' and put his hand along my shoulder here. And he said, 'Have you a key like this?' and I looked at it and I said 'No'; and he said, 'Have you any keys?' and I said 'Yes.' He said, 'Let me have them,' and I gave him my keys, and he said, 'Come down here.' And he took me to the other end where the stewards stay, and he said to me, 'Mercer, I want to have a little talk with you. . . . Do you know anything about any money that has been taken off of this car?' And I said 'No, sir.' And he said, 'Do you know anything about any cigars being taken off of this car?' And I said 'No.' And he said, 'There is $32.00 missing and about two boxes of cigars.' And he searched my pockets to see if I had any cigars, and I did. He asked the steward, 'Are these the cigars?' and he said 'No.' I then asked Mr. Ray was he making the arrest. But he did not answer. Mr. Ray told the officer to take me down and that there would be a man to identify me that night at seven o'clock. . . . I made no resistance,

Mercer v. Fred Harvey, *Corporation.*

but went peaceably with the officer. He took me to a little place upstairs in the depot, where he called the police department for a car. A touring car came and I was taken to my home, where my room was searched and my clothes in my trunks. My keys were taken away from me. They then took me down to number 4 police station and locked me up. It was between 5:30 and 6:00 o'clock by that time. About 7:00 o'clock they called me out and Mr. Mack, the yard foreman of the cleaning-up gang in the yard, said, 'That is the man.' They then locked me up in a cell and I stayed there all night until Mr. Ray came down the next morning between 9:30 and 10:00 o'clock. I was then taken up to the captain's office. Mr. Ray and another steward were present. Mr. Ray said to me, 'Well, Mercer, do you want to go to work?' and I said 'Yes.' He said then, 'All I ask of you is to tell the truth and that if you will tell the truth you can go to work.' I told him that 'I have told the truth,' and he said, 'Then you still deny it?' And I said, 'I have denied nothing; I have just told you the truth.' And he said, 'If you want to work for the Harvey people you tell the truth. I am the one who put you in here and I am the one to get you out.' I told him that if I had to tell a story to get out that I did not want out. He then had the officers come in and one of the officers said, 'You had just as well tell the truth,' and 'You are making it hard on yourself, and people think a whole lot of you over here and you can go on back to work and Mr. Ray will take care of you.' And the officer tried to get me to write a statement, but I refused to do so. I did not steal any money, or take any money, or take any cigars, nor did I take anything else that belonged to anybody else."

On the next day he was taken from the police station to the county prosecutor's office. Ray was present at the time he was taken from the station and also present at the prosecutor's office. There Mr. Ray repeated to the prosecutor the circumstances of the missing cash box and money, and stated that witnesses saw plaintiff leaving the car, or soon after he left the car, with the cash box. The prosecutor wrote up a complaint, but Ray declined to sign it, saying he had no authority to do so, and it was signed by one of the officers. A warrant was issued and plaintiff was arrested. He gave bond in a day or two. The case was continued three or four times in the justice court and eventually dismissed for want of prosecution. This action was then filed.

As to what took place at the time of the arrest plaintiff's testimony is corroborated in part by the witness Sims. To show liability of the defendant company, plaintiff called Mr. Ray, who testified in substance:

"I am . . . assistant purchasing agent of the Fred Harvey Company and have charge of the dining cars of the Frisco and Santa Fe running out of Kansas City. I do not have charge of the service. I employ and hire the men and look after the silverware and equipment and I am in charge of the cars of both the Santa Fe and Frisco out of Kansas City. I am not assistant

superintendent, but am assistant to the purchasing agent. I help Mr. Hillyard, the purchasing agent, to buy supplies for the eating houses. I have all of their clerical work, part of which is buying supplies for the dining car. I have nothing to do with the cash. None of the cash is turned over to me. There is a cashier for that purpose, and it is in charge of the general superintendent. I do not check up the accounts of the dining-car service. I have no other duties besides those outlined above. I do not hire the dining-car stewards. The dining-car stewards have charge of the dining cars and report to the cashier. I have nothing to do with them. I have no other authority than above outlined, and my authority is limited to that extent. I hire and discharge all of the waiters in the dining cars running out of Kansas City for Fred Harvey, and they are under my charge while in the yards. On the Santa Fe I only employ the waiters and cooks of the three cars, those running east. My jurisdiction is in charge of the cars in Kansas City. I do not go out into the yards. No one else hires or discharges the waiters and the cooks. I do not go to the cars. What I do is in the office at the time of hiring and discharging men. I simply furnish the men to the dining cars. I have no charge of the service. I furnish the men and from then on the steward has charge of the service. When a car comes in on the Frisco in the morning . . . there is a man in charge of that car all day, and he is under my jurisdiction. All that I have to do is to hire and discharge men. I hire a man and put him on the car and in charge of the steward. Then if anything goes wrong the steward reports it to me and I get him a new man. The general superintendent in charge is Mr. H. L. Benjamin. He is the general manager."

Appellant contends that its demurrer to plaintiff's evidence should have been sustained. The evidence was sufficient to sustain a finding that Ray directed the arrest and imprisonment of plaintiff and make a *prima facie* showing that the arrest was wrongful. There is no evidence that what Ray did in this matter was within the scope of his employment with the defendant company. The applicable rules of law are quite clearly defined, have been generally followed, and may be thus stated:

(*a*) "The rule of *'respondeat superior,'* or that the master shall be civilly liable for the tortious acts of his servant, is of universal application, whether the act be one of omission or commission, whether negligent, fraudulent, or deceitful. If it be done in the course of his employment, the master is liable; . . ." (*Philadelphia & Reading Railroad Company v. Derby,* 55 U. S. 468, 486; see, also, *Delaware, L. & W. R. Co. v. Pittinger,* 293 Fed. 853; *Smith v. S. H. Kress & Co.,* 98 So. 378 [Ala.]; *Director General of Railroads v. Kastenbaum,* 44 Sup. Ct. Rep. 52.)

This rule applies to corporations as well as to individuals.

(*b*) If the unlawful arrest is caused by a general agent, such as general manager, general superintendent, or one performing the

duties of such an agent, or by a special agent whose general duty is to investigate and prosecute offenses committed against the company, specific authority to cause the arrest in question need not be shown. It will be inferred from the relationship as a matter of law if there is no controversy about the position of the agent. Under some circumstances the authority of the officers causing the arrest may be a proper question to submit to the jury. (*Southern Ry. Co. v. Hall*, 96 So. 73 [Ala.]; *Davern v. Drew*, 138 N. Y. Supp. 1017; *Butler v. Mfg. Co.*, 182 N. C. 547.

(*c*) Where an arrest is caused by a subordinate agent or employee of a corporation there is no implication that he is authorized by the company to do so except when the arrest is made for the protection of the principal's property in his immediate charge or in connection with proceedings for its recovery, or to prevent a crime at the time it is being committed. (*Canon v. Sharon, etc., St. Ry. Co.*, 216 Pa. 408; *Rossman v. American Exp. Co.*, 70 Pa. Supr. Ct. 525; *Daniel v. Railroad*, 136 N. C. 517; *Pinkerton v. Gilbert*, 22 Ill. App. 568; *Bushardt v. United Inv. Co.*, 113 S. E. 637 [S. C.]; *Sacks v. St. Louis & S. F. R. Co.*, 192 S. W. 418 [Mo.])

Of course if the subordinate agent or employee were authorized to make the arrest in question, or his act later ratified by the general manager or some superior officer having authority to do so, the corporation would be liable. (*Carter v. The Howe Machine Co.*, 85 Md. 290.) In this case there is no claim that Ray was specifically authorized to do what he did or that his conduct was later ratified. Hence this question is not in the case.

These rules have been heretofore recognized and applied by this court. (*Hudson v. M. K. & T. Rly. Co.*, 16 Kan. 470; *Comer v. Knowles*, 17 Kan. 436; *Wheeler & Wilson Mfg. Co. v. Boyce*, 36 Kan. 350, 13 Pac. 609; *Garnier v. Squires*, 62 Kan. 321, 62 Pac. 1005; *Kemp v. Railway Co.*, 91 Kan. 477, 138 Pac. 621; *Brown v. Railroad Co.*, 111 Kan. 338, 207 Pac. 196.)

Applying these rules of law to this case, it is noted that Ray was assistant purchasing agent. He hired and discharged waiters and cooks on the dining cars and had charge of provisions, silver and table linen furnished the cars. Ordinarily he did not go about the cars; his work was in the office. He did not employ the steward in charge of the car, and had nothing to do with the receipts. All cash received was handled through another department. The property reported to have been stolen was not property which

Ray was employed to look after, nor was he responsible for it in any way. When he was doing anything about that he was not doing anything for which he had been employed by appellant. The plaintiff spoke of Ray as the superintendent, but that term does not imply authority to cause an arrest for the larceny of property not in his care. (*Markley v. Snow*, 207 Pa. St. 447.) But aside from that general statement, the evidence clearly showed his position with the company and his duties to be as above stated. The demurrer to the evidence should have been sustained. As a citizen Ray had a right—in some situations it would be his duty—to give police officers such information as he had concerning any crime that had been committed. But the fact that he might do so at a time when he was employed by appellant would not make appellant liable for his acts. There was nothing in defendant's evidence which aided plaintiff's case. It necessarily follows that the judgment must be reversed with directions to sustain the demurrer to the evidence and render judgment for defendant.