No. 38,487

Eunice C. Hammargren and Wallace F. Hammargren, *Appellees,* v. Montgomery Ward & Company and Goldie Wehby, *Appellants.*

(241 P. 2d 1192)

Opinion filed March 8, 1952.

*Emmet A. Blaes,* of Wichita, argued the cause and *W. D. Jochems, J. Wirth Sargent, Roetzel Jochems, Robert G. Braden, S. C. Durbin* and *J. Francis Hesse,* all of Wichita, were with him on the briefs for the appellants.

*Lloyd M. Kagey* and *Payne H. Ratner,* both of Wichita, argued the cause and *Max L. Hamilton, Keith Eales, Ora D. McClellan, Eugene L. Pirtle, Louise Mattox, Payne H. Ratner, Jr., Keith Sanborn, Edgar M. Miner* and *Gerald L. Michaud,* all of Wichita, were with him on the briefs for the appellees.

The opinion of the court was delivered by

SMITH, J.: This action was to recover for damages alleged to have been sustained when plaintiffs were caused to be falsely imprisoned by defendants. Judgment was for the plaintiffs and defendants have appealed.

There were two actions, one by the wife and one by the husband. They were consolidated in the trial court and tried together. They have been presented in this court as one appeal. Hereafter the pleadings will refer to the pleading in the case of the wife since they are identical with the exception of the names. At the outset, the George Innes Company, one Wertz and one Marshall, as well as Montgomery Ward and Company and one Wehby were defendants. During the course of the trial plaintiffs dismissed as to the George Innes Company and Wertz. The demurrer of Marshall to the evidence was sustained and the trial proceeded against Montgomery Ward and Wehby.

The petition alleged the identity of the parties; that R. G. Marshall was an agent and employee of Montgomery Ward and the acts performed by him were in the course of his employment; that defendant Wehby was the store detective in the retail store for Montgomery Ward and the acts performed by her were in the course of her employment; that Wertz was employed by the George Innes Company as a floor walker and supervisor.

The petition then alleged that on September 29, 1948, the plaintiff was making a purchase of merchandise in the Montgomery Ward store with her husband; that they gave a check in the amount of the purchase price for some merchandise to an employee of defendant, together with identification and credit cards; that after waiting an unreasonable length of time she, with her husband, went to the office of the defendant and found an employee of defendant, who stated

that she had been unable to find anyone to approve the check; that the check and identification cards were returned to her husband and he destroyed the check and left the store; that she, with her husband, then went to the George Innes Company store; that while so engaged in shopping in that store Marshall and Wehby, agents and employees of Montgomery Ward, entered the George Innes Company store and consulted with Wertz and one of the defendants called the Wichita police department and requested a police officer to be sent to the store; that about four o'clock on the 29th of September, 1948, Montgomery Ward using its agents and employees, Marshall and Wehby, and George Innes Company through its agent and employee, Wertz, all of them acting in the course of their employment unlawfully, maliciously and willfully and without cause caused the plaintiff to be taken into custody by an officer of the Wichita police department and to be transported against her will to the police station with the intent to injure her; that she was compelled by force to accompany the police officer, whereupon she was imprisoned and restrained of her liberty for a period of more than one hour, all without cause and without any right or authority and against her will, all at the direction of each and every one of the defendants, whereby she was humiliated and mortified and her character and credit discredited and such false imprisonment caused her credit and standing to be injured; she was prevented from attending to her necessary business during the time she was falsely imprisoned and her health was impaired so it was necessary that she be under the care of a doctor, all on account of this false imprisonment; that neither Montgomery Ward, George Innes Company, Marshall and Wehby nor Wertz filed any complaint or formal charge against her.

The petition then alleged because of these unlawful, willful and malicious acts she had suffered actual damages in the amount of $10,000 and punitive damages in the amount of $20,000.

She prayed for judgment for that amount.

The answer of Montgomery Ward, Goldie Wehby and R. G. Marshall was a general denial.

The petition of the husband was identical.

The jury returned a verdict in favor of the wife in the amount of $10,000 actual and $10,000 punitive damages and for the husband $7,500 actual and $10,000 punitive damages. It answered special questions as follows:

"No. 1. Q. Was the conduct of Wallace F. Hammargren at the Montgomery Ward store in Wichita in presenting a check drawn on a bank in Cambridge, Minnesota, and then, when there was a delay in getting it approved, tearing it up, of such a nature as to cause a reasonable, cautious person to become suspicious of his character or intentions? Answer: No.

"No. 2. Q. Do you find that when Goldie Wehby communicated with Officer Donald Walters in the George Innes store, that she acted in good faith and as a reasonable, cautious and prudent person would do under the circumstances? Answer: No.

"No. 3. Q. If you answer question No. 2 in the negative, state in what regard she failed to act in good faith or as a reasonable, cautious or prudent person would have acted under the circumstances. Answer: She acted with undue haste, with lack of sufficient facts, malice of legal nature, and with lack of proper motive based on no reasonable grounds.

"No. 4. Q. Whom if anyone, do you find requested Officer Walters to bring the plaintiffs to the detective office for questioning? Answer: Lt. Cook.

"No. 5. Q. Do you find that when the plaintiffs accompanied Officer Donald Walters from the George Innes Company store to the office of Detective Frieson, they did so voluntarily or involuntarily? Answer: Involuntarily.

"No. 6. Q. If, in answer to question No. 5 you find that the plaintiffs accompanied the officer involuntarily, state what the police officer said or did to cause the plaintiffs to go to the police station involuntarily. Answer: Officer Walters asked the plaintiffs to go to the police station with him to talk to the Lt. When the plaintiffs asked Officer Walters if they had to go with him, Officer Walters said, 'Yes, you have to go.'

"No. 7. Q. If you find for either of the plaintiffs and award punitive damages for such plaintiff, state what malice or wrongful motive you find prompted the defendants, or either of them, and on account of which such punitive damages are allowed. Answer: Pursuit of said plaintiffs to Geo. Innes Co. store with lack of proper motive, insufficient evidence, and causing them to be taken into custody by the Police constitutes legal malice and sufficient wrongful motive in itself."

The defendants, Montgomery Ward and Goldie Wehby, filed a motion for judgment and to set aside special findings and for a new trial as follows:

"1. That judgment be entered against the plaintiffs and in favor of these defendants for the reason that no cause of action has been stated or proved against these defendants.

"2. For judgment, notwithstanding the general verdict, upon the Jury's answers to the Special Interrogatories, particularly Interrogatory No. 4.

"3. In the alternative, that the answers to Special Interrogatories numbered 1, 2, 3 and 7 be disapproved and set aside by the Court for the reason that the same are not supported by the evidence and are, in fact, contrary to the evidence.

"4. And in the alternative, that the defendants individually be granted a new trial for each and all of the following reasons:

a. Because of the abuse of discretion of the Court, misconduct of the jury

and of the plaintiffs, accident and surprise against which ordinary prudence could not have guarded,

    b.  Erroneous ruling and instructions of the Court,

    c.  That the verdict was given under the influence of passion and prejudice,

    d.  That the verdict is in whole and in part contrary to the evidence."

This motion was overruled and judgment was entered on the general verdicts.

Defendants appealed from all adverse judgments, orders and decisions and in particular from the final judgments and from the rulings of the trial court on the motions for judgment, for setting aside special findings and for a new trial.

The specifications of error were as follows:

"1. The Court erred in overruling the motion of the defendants Montgomery Ward, & Company and Goldie Wehby for judgment on the opening statement of the plaintiffs.

"2. The court erred in admitting Exhibit No. 2 and evidence of the net worth of the defendant, Montgomery Ward & Company.

"3. The Court erred in overruling the demurrer of the defendants Montgomery Ward & Company and Goldie Wehby to the plaintiff's evidence.

"4. The Court erred in refusing to give the instructions requested by the defendants Montgomery Ward & Company and Goldie Wehby.

"5. The Court erred in instructing the jury, particularly in Instructions Nos. 8, 9, 10, 12 and 13.

"6. The Court erred in giving an oral instruction to the jury in violation of G. S. 60-2909 and G. S. 60-2913.

"7. The Court erred in overruling the motion of defendants Montgomery Ward & Company and Goldie Wehby for judgment, setting aside findings or for new trial.

"8. The Court erred in admitting hearsay evidence from the witness Cook as to conversations had with Officer Walters."

At the conclusion of the plaintiffs' evidence the defendants demurred to it and this demurrer was overruled to all except defendant Marshall. It was sustained as to him.

Defendants' first argument is that the court erred in overruling the demurrer to the evidence. The argument in this connection is that since the sole testimony of the plaintiffs was that the defendant Wehby merely reported facts and information to the officer without requesting any police action, even though the police detained plaintiffs, and no action for false imprisonment lies against defendants.

We start the consideration of this argument under the rule that in consideration of a demurrer to evidence all the evidence introduced by the plaintiffs must be taken as true and all reasonable inferences and deductions must be drawn therefrom in favor of the

theory of the plaintiffs and if when so considered there is any substantial evidence to sustain the plaintiffs' case, the demurrer should be overruled. (See *Clark v. Southwestern Greyhound Lines,* 148 Kan. 155, 79 P. 2d 906; *Jones v. McCullough,* 148 Kan. 561, 83 P. 2d 669.) Furthermore, every fact which is fairly and logically to be inferred from the evidence must be drawn in favor of the plaintiffs. (See *Greep v. Bruns,* 160 Kan. 48, 159 P. 2d 803.)

The evidence of plaintiffs was that they entered the Montgomery Ward Retail store and since they contemplated buying articles in different departments asked the clerk for a purchase slip, upon which articles purchased in different departments could be entered and settled for at the central desk by one payment. After twenty or thirty minutes the clerk told plaintiffs that no such slips were obtainable at that time; Mr. Hammargren then wrote a check for $13.42, the exact amount of the merchandise they wished to buy, and gave it to the clerk, together with credit cards issued to him from three hotels.

This check had the name of plaintiff with the address "Wichita, Kansas" printed on it and it was drawn on a bank in Cambridge, Minn. At the time of the incident described he had a low credit balance of $1,976.15 and a high credit balance of $3,608.21. The clerk took the check and credit cards saying the check would have to be approved and left the Hammargrens standing at the counter. After another twenty or thirty minutes had passed and the clerk did not return, upon inquiry Hammargren learned that the clerk had gone to the credit department on the fifth floor with the check and credit cards. Hammargren went to the credit department; found the sales clerk, to whom he had given his check. He asked for some explanation and was told that the telephone operator had the check and was attempting to locate a store executive who alone could approve or disapprove it. He thereupon asked for his identification cards and the check and when he received them he tore the check up and returned to his wife. They then left Montgomery Ward's, met a friend and all three went directly to the George Innes Store, a block and a half away.

Defendant Wehby had been employed as a store detective in Montgomery Ward's for several years. She was well known to the police officers and had on many occasions brought persons to the police station. Sometime after the Hammargrens had reached the George Innes store officer Walters of the police department was di-

rected by the radio operator-dispatcher to contact a Mr. Wertz at that store. When he arrived there he was told by someone to see Goldie Wehby, who was on the fourth floor. (Wehby, it will be remembered, was the store detective for Montgomery Ward's and had no connection with the Innes store.) Mrs. Wehby told the officer that the Hammargrens had been shopping at Ward's and Mr. Hammargren had written a check; that when he was informed the check would have to be examined and okayed before it could be cashed he had torn it up and left the store; that she had followed Mr. and Mrs. Hammargren from the Montgomery Ward store to the Innes store. She pointed out Mr. Hammargren and identified him to the officer as the person who had written the check.

The officer called the lieutenant at the police station, a man who had known Mrs. Wehby for a period of years and who knew she was the house detective at Ward's store. Walters told the lieutenant that Mrs. Wehby had identified the Hammargrens as the people she had followed from Ward's to the Innes store and repeated the story substantially as had been told to him by Mrs. Wehby. The officer then asked the lieutenant if he should bring the Hammargrens to the police station and the lieutenant said "Yes."

Walters, in uniform, with shield, badge and gun, approached the Hammargrens and asked Mr. Hammargren if his name was "Hammargren." Hammargren said it was. Walters then said "You come with me." "The lieutenant wants to talk to you." Hammargren wanted to know why and officer Walters said "Well evidently there has been some misunderstanding." Hammargren said "Do I have to go?" And the officer said "Yes you do." Mrs. Hammargren asked if she had to go, too, and officer Walters said "Yes." After some colloquy the third person with the Hammargrens was told he had to come along too. The officer took them to the public elevator and from the second floor to the ground floor and thence in a squad car, easily identified as a police car, to the police station.

Shortly after the officer had accosted the Hammargrens and told them they would have to go Mr. Hammargren said there would be a lawsuit. They arrived at the police station at about 4:35 and Mr. Hammargren was questioned by two detectives and at about 5:15 o'clock they were told they were free to go.

The police officer testified that when he received the call he went to the Innes store; that someone whom he did not know met him at the door and directed him to the fifth floor; at the fifth floor

Wehby was pointed out to him; that he had a conversation with her. He then testified:

"Q. O. K., go ahead. Did you talk to her then? Did you tell her who you were or anything? A. Yes I had a conversation with her.

"Q. All right, what did she tell you and what did you tell her? A. She told me that this man and woman had been shopping in Ward's and that the man had written a check and when he was informed the check would have to be examined and O. K.'d before it could be cashed that he had torn the check up and immediately left and that she had followed them to Innes.

"Q. Yes? A. She pointed out Mr. Hammargren and identified him as the person who had written the check and I went to the telephone and called my Lieutenant and told him what she had told me.

"Q. When you talked to him did you tell him who had told you that? A. Yes I believe I did.

"Q. O. K., go ahead. A. I asked him if I should bring them to the station and he said 'Yes'.

"Q. Then what was next? A. While I was making the phone call I believe they left that floor and I went down on the elevator thinking they would be leaving the store.

"Q. Now when you started to go down the elevator did Mrs. Wehby stay where she was or did she go any place or what did she do? A. I don't recall exactly where she did go at that time.

"Q. Go ahead. A. I was notified that they were on the second floor. I don't recall that it was Mrs. Wehby, but I went to the second floor and I believe it was on the second floor they were looking at bed spreads. I went over and asked Mr. Hammargren what his name was and he showed me a blank form from the store with his name on it and I think I wrote his name down and I told him I would have to ask him to come to the station with me to see the Lieutenant and he wanted to know why and I told him I thought there had been a misunderstanding of some kind on a matter of a suspicious nature.

"Q. Go ahead. A. And he seemed to be cooperating as far as my request was concerned but he verbally protested to the effect that there would be a lawsuit.

"Q. That what? A. That there would be a law suit.

"Q. All right? A. And I believe I asked him if the lady there was his wife and one of them answered, I believe Mr. Hammargren, that she was, and I believe she said 'do you want me to go too?' and I said 'Yes, I would like for you to' and she mentioned something about being embarrassed and then the other man, Mr. McCormick I believe is his name, came over and joined them. I don't remember the exact conversation. I think I asked him to come along also and then we left the store by way of the elevator and my car was parked at the south entrance of Innes. The door was being repaired at the time and was closed or blocked off some way, I don't recall. I had to take the car and go to the station and Mr. Hammargren there on the way to the station was anxious to know the origin of his being called into the station and Mr. Mc-Cormick said something about the Wichita police department being fast and I told him they weren't that fast, and then Mr. McCormick stated 'You are so tall they could spot you anywhere.'

"Q. Talking to you? A. No, to Mr. Hammargren.

"Q. I see. A. That's about all the conversation I can recall."

One detective who had been with the department twenty years testified that Wehby was a store detective at Ward's and on occasion had brought people into the police station.

Another police officer testified that on the date in question he had a conversation with officer Walters about Wehby and some people she had pointed out as being suspicious characters. There was an objection on the part of defendants and after some colloquy the witness was permitted to state that Wehby's name was mentioned and that after the conversation he instructed Walters to bring the defendants in.

Defendants argue that all the above evidence proved was that Wehby saw some suspicious circumstances connected with the Hammargrens and reported it to the police. They refer to Instruction No. 10½ which the court gave in this case. It is as follows:

"You are instructed that when a person in good faith, acting as a reasonable, cautious and prudent person under the circumstances upon the information which he or she has received, believes that the actions of a person are suspicious, he has a right to inform the police of the fact and of his belief so formed, and if in so doing he acts without any malice or sinister motive, such person is not responsible for any arrest which may follow, made by the police authorities acting upon their own volition although based in whole or in part upon the information given such police authorities."

Defendants argue that had the court applied the above rule of law to the facts when considering the demurrer, the demurrer to the evidence would have been sustained.

Actually the evidence is not entitled to quite the construction placed upon it by the defendants. We must in considering this argument draw all reasonable inferences in favor of the plaintiff.

Any cause of action may be proved by circumstantial evidence as well as by direct. Here we have the incident in the Ward store, the check being given, the long wait, later the check demanded back, torn up, thrown on the floor and the Hammargrens leaving, a few minutes later the Hammargrens at the Innes store, a block and a half away, the call to an officer, defendant Wehby at the Innes store, the police officer being directed to her, she pointing out the Hammargrens, (the jury and trial court were entitled to infer that she told him the Hammargrens' name, since he would have had no other means of knowing, and she must have gotten the name off the check or the credit cards, since she would have had no other way of know-

ing it,) then her statement to the officer about what happened at the Ward store, which under the rules of considering a demurrer to the evidence we must consider as not true because it is not the story of what happened, if we are to believe Hammargren's testimony, as we must on a demurrer to the evidence. She told the officer he left when told the check would have to be examined and okayed before it could be cashed. We have already stated his story, which was an entirely different version of the affair.

The jury would be entitled to presume from the testimony of the officers and the Hammargrens that Wehby caused the radio call to be made that brought officer Walters there; that she had followed the Hammargrens to the Innes store, pointed out the Hammargrens to the officer and told him officer Walters called the lieutenant at the station and when he told the story and mentioned Wehby's name the officer proceeded to arrest the Hammargrens. Once we take all these facts as true, which we must do on considering a demurrer to the evidence, then a reasonable inference to be drawn from all of them is that Wehby caused this arrest.

We will examine the question of whether the circumstances at the Ward store were such as to compel a conclusion that Wehby acted in good faith or as a reasonable, cautious and prudent person would act or that the circumstances were suspicious. In the first place, the check was given for the exact amount of this purchase. It is a reasonable inference that everyone in business, especially a store detective, would know a bad check artist ordinarily uses the device of purchasing a small amount of merchandise and giving a check for more than the purchase price and thus pocketing the change. In the second place, Hammargren used a check form that would attract attention. It is a reasonable inference this is something ordinarily a bad check artist would avoid. In the third place, he used a distinctive name. It is a reasonable inference that bad check artists use a name that lends itself readily to anonymity. In the fourth place, he gave the girl credit cards, two of them on Wichita hotels with his name on them. A minute's telephone call to one of these hotels would have shown if he was a phony. In the fifth place, he tore the check into four pieces and threw them on the floor, thus leaving a ready means of identification, just before he left. In the sixth place, in considering a demurrer to the evidence we must presume he and his wife had a natural and explainable reason for asking for the return of the check and leaving. These

facts we must take as true and from them draw all reasonable presumptions in favor of plaintiffs.

Defendant argues they compel an inference that an ordinary, reasonable, cautious and prudent person would consider them suspicious. We cannot so hold. Granting for the sake of argument that Wehby was entitled to weigh these circumstances as an ordinary, reasonable person, still it is a question for the jury whether these circumstances were suspicious and whether she did act as an ordinary reasonable person.

In *Lemmon v. King*, 95 Kan. 524, 148 Pac. 750, the plaintiff had been arrested without a warrant. He recovered judgment and on appeal we said:

"A reversal is asked on the ground that the defendant could not be liable for the arrest, conceding it to have been wrongful, unless he requested it or directed it, and that there was no evidence at all to that effect. The contention fails because while there was much testimony that the defendant merely reported the facts, and that the officer acted only on his own initiative, or by the direction of his superior, there was some to the contrary."

This opinion is reported in Ann. Cas. 1917 E p. 401. At page 406 there is a statement fortified by an imposing list of authorities that

"It is well settled that where a private person induces an officer by request, direction, or command to arrest another without a warrant and without an offense having been committed in view of the officer, he will be liable for false imprisonment unless he justifies by showing that the charge was well founded."

We have already demonstrated that considering the record under the rules applying to a consideration of a demurrer to the evidence, there was substantial evidence here to warrant submission to the jury of whether Wehby caused and instigated this arrest. The rule is stated in *Hoock v. Kresge Co., et al.*, 222 S. W. 2d 568. There the court held that one seeking to recover for false arrest must prove that he was unlawfully caused to be arrested by defendants, and, though it is not necessary that the arrest was directly ordered, it must appear that persons sought to be charged either instigated it, assisted in arrest, or by some means directed, countenanced, or encouraged it.

The above is but a variation of the rule that a cause of action may be established by circumstantial evidence. Actually there is but slight difference between these parties as to the applicable law. The only difference is as to the presumptions and inferences to be drawn from the facts.

Defendants argue that we should weigh the evidence and reach a conclusion other than that reached by the trial court and the jury. No one point in our law is any better established than that we cannot do that, on the consideration of a demurrer to the evidence. They ask us to examine the ultimate facts and draw an inference from these facts other than that drawn by the trial court and the jury. We cannot do that where the inference drawn by the jury was a reasonable one. Here we have already demonstrated the inferences drawn by the jury and contended for by the plaintiffs were reasonable. Counsel for defendants stated in their reply brief:

"The plaintiffs contend with great vehemence that Goldie Wehby gave Officer Walters a highly colored, distorted, or even untrue statement of the facts. Such a claim is patently false. It is merely necessary to take Hammargren's own testimony and compare it with the undisputed statement given by Mrs. Wehby to Officer Walters, and it will be immediately seen that she did not distort the facts in any manner. As demonstrated by the plaintiff's own evidence, Mrs. Wehby gave the officer all of the facts within her knowledge, and what she gave the officer was in exact conformity with the events that had occurred."

There is substantial evidence from which the jury was warranted in believing that Wehby did make an untrue statement to Walters as to what happened in the Ward store. We are bound to reach such a conclusion when we consider this evidence under the rules for the consideration of demurrers to the evidence.

Defendants next argue that Montgomery Ward was not liable for any acts of defendant Wehby which were not expressly authorized or implied from authority given her. They argue that her own conduct could not supply proof of the scope of her authority. To maintain this argument they cite and rely on *Lewis v. Montgomery Ward & Co.*, 144 Kan. 656, 62 P. 2d 875, where we held:

"Where an arrest is caused by a subordinate agent or employee of a corporation there is no implication that he is authorized by the company to do so except when the arrest is made for the protection of the principal's property in his immediate charge or in connection with its recovery or to prevent a crime at the time it is being committed."

In the case of *Mercer v. Fred Harvey, Corporation*, 116 Kan. 365, 226 Pac. 761, in dealing with a similar question we said:

"If the unlawful arrest is caused by a general agent, such as general manager, general superintendent, or one performing the duties of such an agent, or by a special agent whose general duty is to investigate and prosecute offenses committed against the company, specific authority to cause the arrest in question need not be shown. It will be inferred from the relationship as a matter of

law if there is no controversy about the position of the agent. Under some circumstances the authority of the officers causing the arrest may be a proper question to submit to the jury."

It was stipulated at the trial Wehby was at the time of the events related a store detective for Montgomery Ward & Company and that she was working on that particular day. There was evidence from which a presumption that she was at the store and followed Hammargren down the street was a reasonable one. Certainly a reasonable inference to be drawn from the fact that she told the officer the story and pointed the Hammargrens out to the officer was that she was a house detective and was working. There was evidence as already noted in this opinion that the police had known her for a period of years, and that she had on numerous occasions brought persons to the police station. Such an agent has far greater authority than the ordinary employee.

In this connection defendants complain of a paragraph in Instruction No. 10 as follows:

"What her authority actually was may be implied from the conduct of the parties and the things that were actually done and the facts and circumstances surrounding the transaction."

There was substantial evidence upon which to base this instruction. Here again we must draw all reasonable inferences in favor of plaintiff. The rule is stated in 22 Am. Jur. 380, Sec. 37 as follows:

"The fact that an agent, through lack of good judgment or proper discretion, or infirmity of temper, or under the influence of passion aroused by the circumstances, has gone beyond the strict line of his duty or authority and inflicted unjustifiable injury upon another does not relieve the master from liability.

"The liability of a master or principal for the act of his servant or agent in causing a false arrest or imprisonment depends upon whether the master or principal previously authorized the act, or subsequently ratified it, or whether the act was within the scope of the servant's or agent's employment; and in the determination of the scope of authority of the agent and the responsibility of the principal, liberality must be accorded the person falsely imprisoned." (§ 37.)

In *Chesapeake & Potomac Telephone Co. v. Lewis* (USCA DC) 99 F. 2d 424 (1938) the court held that if defendant or defendant's agent actually took part in the arrest or imprisonment of plaintiff or procured or instigated acts of officers of the law, the defendant is liable in an action for false imprisonment. Uncontradicted testimony showed that the officers who arrested plaintiff did not know him by sight and arranged with defendant's employee Whip, who

did know him, to go with them in order to identify him. The jury might infer that the officers would not have started without Whip. Although Whip remained in a car while the officers entered a building and made the arrest, they promptly brought plaintiff to the car and the jury might infer the identification which Whip then made was an essential factor in plaintiff's ensuing imprisonment.

See, also, 22 Am. Jur. 384, Sec. 44, where it is held:

"Positive evidence is not required to make out a case. Thus, where a private detective has express authority to arrest or cause the arrest of offenders or such authority is clearly implied from the general scope of his duties, there is no question but that the master is liable in case a wrongful arrest is made."

There was substantial evidence from which the jury could infer that the acts of Wehby in pursuing the Hammargens from Montgomery Ward's store to the Innes store and there making a misstatement of the occurrence in the Ward store were authorized and within the scope of employment as a house detective.

Defendants next argue that proof Wehby was a house detective for Montgomery Ward & Company on the day in question did not prove her authority to bind Montgomery Ward for an arrest alleged to have been caused by her off her employer's premises and in another mercantile establishment where neither property or crime against her employer was involved. There was substantial evidence from which the jury might infer that Wehby was on duty as a house detective at the time in question.

There is a discussion of this question in 35 A. L. R. 679. The rule stated in *L. S. Ayres & Co. v. Harmon,* 56 Ind. App. 436, 104 N. E. 315 (1914) is approved there. A comment on this case states:

"Similarly, a private detective employed by a department store, whose duty it was 'to guard and protect its property from theft, and to report to the company or to the city detectives when any acts of larceny were committed,' has been held to have been acting within the scope of her authority in following a person suspected of theft, and procuring his arrest away from the company's premises. *L. S. Ayres & Co. v. Harmon* (Ind.), supra, wherein the court said that the act of the detective 'when directing the attention of the policeman to a person whom she believed had committed the crime in question, even though said person was not actually on the premises of appellant, L. S. Ayres & Company, and the arrest of appellee by the officer pursuant to said Information, though not on the premises of said appellant, is well within the rule making appellants liable.' "

In the above case the Indiana Court of Appeals said that the act of the detective when directing the attention of the policeman to a person whom she believed had committed the crime in ques-

tion, even though said person was not actually on the premises of appellant, L. S. Ayres & Company, and the arrest of appellee by the officer pursuant to said information, though not on the premises of said appellant, is well within the rule making appellants liable.

Here again we remark we are compelled to examine this evidence under the rules for the consideration of demurrers to the evidence. There was substantial evidence from which the jury was warranted in drawing the inference that Wehby was acting within the scope of her authority when she followed the Hammargrens to the Innes store and caused their arrest.

Defendants next argue there was no evidence of malice and the court erred in permitting the issue to be considered by the jury. This was instruction No. 9. It stated, in part:

"Before you can render a verdict for the plaintiff for punitive damages, you must find that there was actual damages in some substantial amount, and also that there was malice, or a wanton and willful invasion of the plaintiff's rights.

"Malice is defined as any indirect motive of wrong, and in a legal sense, any unlawful act which has been willfully and purposely done to the injury of the plaintiff is malicious; and by malice is meant not the act but the motive which prompts the act. It consists of a bad motive or such reckless disregard of the rights of others as to show evil intent. It is an act based upon an improper motive and does not necessarily presuppose personal hatred, ill will or revenge. The improper motive or want of improper motive inferrable from the wrongful act based upon no reasonable ground constitutes of itself all the malice deemed essential in law to entitle the plaintiffs to recover punitive damages if they are entitled to recover damages as herein instructed.

"Whatever is done willfully and purposely, if it be at the same time wrong and unlawful, and that known to the defendant, is, in legal contemplation, malice."

Defendants argue there was no evidence in the case to warrant any such instruction. Defendants quote from *Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 106 P. 2d 652, where we quoted with approval a rule stated in 17 C. J. 984, § 281, as follows:

" 'An act will not be deemed malicious, and so warranting punitive damages, merely because it is unlawful or wrongful. Nor would the circumstances that defendant would be liable to a criminal prosecution for the act complained of be in itself sufficient to determine his liability in exemplary damages. But it has been laid down as a general proposition that the intentional doing of a wrongful act with full knowledge of its character, and without cause or excuse, is malicious so as to warrant an award of exemplary damages.' "

There is nothing wrong with that rule. The evidence justifying such an instruction has been stated a number of times already in this opinion. If the jury believed Hammargren's story of what hap-

pened and why he left the Ward store and officer Walters' evidence of what Wehby told him, this constituted substantial evidence from which the jury was warranted in finding that her acts there were wrongful, intentional, and with full knowledge of their character, and without just cause or excuse.

Defendants next argue that the trial court erred in admitting into evidence a page from Standard and Poors record what purported to be a comparative balance sheet of Montgomery Ward's. A broker was first put on the stand and he was asked the question:

"Will you state to the Jury what the net worth of Montgomery Ward & Company is, according to the lastest records that you have?"

There was an objection to this on the ground that it was hearsay and had no relationship to the case. After some further examination of the witness out of the presence of the jury and colloquy between court and counsel witness was permitted to put in evidence a page in the book.

Plaintiffs argue that they offered an expert witness as to the worth of Montgomery Ward's and that the page was offered at the request of counsel for defendants. Plaintiffs rely in the main on this point on the rule that where counsel for one party causes or invites a particular ruling, that party cannot later argue that such ruling was erroneous. An examination of this record convinces us that counsel for defendants insisted at all times that this page was hearsay. It was incompetent and should not have been admitted. (See *Lewis v. Coleman*, 194 Wash. 674, 79 P. 2d 633; also *Young's Market Co. v. Laue*, 60 Ariz. 512, 141 P. 2d 522.) We do not in view of all the surrounding facts and circumstances regard its admission as so prejudicial as to require a reversal.

Defendants next argue it was error to receive this page since it was evidence of the net worth of only one of the defendants jointly liable. It was competent to introduce evidence of the wealth of the parties on the question of punitive damages. This evidence was as to the wealth of one of them only. They were jointly liable. (See *Washington Gas Light Co. v. Lansden*, 172 U. S. 534, 43 L. Ed. 543, 19 S. Ct. Rep. 296.) Under such circumstances it was error to introduce this as to one of defendants. There was no evidence as to the wealth of Wehby. There was no instruction as to how this was to be considered. Plaintiffs make the point that this objection was not made at the trial. Perhaps this is true. In view of the conclusion we will discuss presently as to the disposition to be made of the

appeal, we do not regard these errors so prejudicial as to require a reversal.

Defendants next argue it was error for the trial court to transmit through the bailiff an oral instruction while the jury was deliberating. That came about this way—the jury after it started to deliberate asked the bailiff for the exhibits. Evidently some members of the jury thought some checks, which had been offered in evidence, and an objection to which had been sustained, had actually been received. The jury asked for those checks. The trial court told the bailiff those checks had not been admitted and the bailiff so advised the jury. We discern no error in that.

Defendants next argue that counsel for plaintiff was guilty of such misconduct as to require a new trial. The first instance of such misconduct, as stated by counsel for defendants, has to do with those checks. Counsel for plaintiff said in his opening statement that Hammargren had cashed many checks similar to the check in this case in the vicinity of Wichita and he never had any trouble. He had a bunch of these checks in his hand and during the examination of Hammargren they were offered. Defendants' objection to them was sustained for the moment. Later he offered them again and the objection was finally sustained. The announced purpose of counsel in offering those checks was for whatever weight they might have in showing that there was nothing suspicious in Hammargren offering the check at Ward's. Counsel for defendants contend it was so well settled that these checks were not admissible for any purpose, that for counsel to offer them was misconduct. We cannot attach so much weight to this offer. To do so would tend to subject counsel to the charge of misconduct every time evidence was offered and the offer refused. Counsel for defendants make a point of the fact that counsel offered these checks on three different occasions. The first time they were offered the trial court sustained defendants' objection for the moment. On account of this sort of ruling counsel naturally offered the checks again.

Defendants also argue counsel for defendants was guilty of misconduct in presenting the evidence of a telephone conversation between the two policemen. The police lieutenant was on the stand. He was asked whether officer Walters had called him from the Innes store on the date in question. When he answered in the affirmative, he was asked whom the conversation was about. Counsel for de-

fendants objected to this and the objection was overruled. The answer was "Goldie Wehby." He then was permitted to testify that after the conversation he instructed Walters to bring the Hammargrens in. We see no misconduct here. There was no testimony as to the conversation. Officer Walters had already testified to this conversation without objection on the part of defendants. The telephone call was said to have been made immediately after Wehby had talked to Walters and identified the Hammargrens and had told the officer her story of what happened at the Ward store. The reasonable presumption is that the call to the police station was the result of the talk between Wehby and Walters.

Defendants next argue that counsel for plaintiffs was guilty of misconduct in his argument to the jury. This argument is based on an extract from the final argument as follows:

"The trouble is that Goldie Wehby didn't tell the police all about this. She is the one that concealed these things from the police officers and all the policeman wanted to know was who was asking for the complaint and who was asking that they be arrested. Goldie Wehby's name was mentioned and that was all that was necessary. The police came right over there and picked them up."

Counsel for defendants state in their brief in this court:

"There is not a single word of evidence to support these crucial accusations against defendant Wehby. The following facts are undisputed in the record from the lips of the plaintiffs' own witnesses, and they put the lie to such accusations:

"(1) The police came to the Geo. Innes Company store as a result of a radio call to go there and to contact Mr. Wertz, a supervisor of the store. Goldie Wehby had nothing to do with it.

"(2) Goldie Wehby never once asked for any complaint nor that any arrest be made, and there is a conclusive finding by the jury that the only person who ever requested such action was Lieutenant Cook at the police station.

"(3) What Goldie Wehby told Officer Walters did not cause him to make any move whatsoever against the plaintiffs. On the contrary, he refrained from making any move on the basis of the information she had given him and acted only on the basis of directions from a superior officer."

The trouble about that argument is defendants did not submit any evidence in the trial court, neither did they make any argument to the jury. They make for the first time in this court the argument they could have made there. There was substantial evidence from which the jury was warranted in finding all the above facts in favor of plaintiffs and against the contentions of defendants. The fact that Wehby told a story other than the truth about what Mr. Ham-

margren did at the Ward store is some evidence that she concealed what actually happened from the police.

Defendants next argue that the verdicts for compensatory damages were so excessive as to be explainable only by passion and prejudice. The jury returned a verdict for Mrs. Hammargren for $10,000 actual and $10,000 punitive damages. In Mr. Hammargren's case it gave him $7,500 actual and $10,000 punitive damages. The actual damages she pleaded were "her credit and standing in the community was injured, she was prevented from attending to her necessary business and affairs during the time she was falsely imprisoned, and her health was impaired to such an extent that it was necessary that she be confined and under the care of a doctor." Mr. Hammargren pleaded about the same damages. She testified:

"That they went home where she broke down and cried, and her husband called the doctor next day after she had spent a sleepless night and he had spent a sleepless night with her. Dr. Coleman was called and gave her a sedative for several weeks. That when she went shopping, she had the most uncertain feeling that a policeman might pounce on her again and she also had crying spells for months.

"That eight months later she became pregnant and she worried about whether it was going to effect her child; that she still thinks she will be pointed out as a criminal. That she had never had the frequent spells of crying and sobbing before September 29, 1948."

A doctor testified:

"That on or about September 29, 1948, he was called to the Hammargren home and when he walked in he heard Mrs. Hammargren crying. That he examined her and found her considerably upset and had a little difficulty in getting her to answer his questions. That final examination established her temperature was normal; pulse and respiration slightly increased; and the doctor stated he would say she was suffering from 'some reaction or what we call deferred state of shock.' That he gave her some sedative out of the satchel and then sent her some prescription from the drug store. That he received no further call from the Hammargrens."

This is all the testimony there was as to actual damages suffered by Mrs. Hammargren. It will be noted the Hammargrens were never actually locked up. They were at the station a little less than an hour. On the question of actual damages Mr. Hammargren testified that for three months after the events described he felt that possibly the knowledge of what had happened had preceded him when he met people in business and that they looked on him as not a reputable character and that his earnings for that three months' period were the lowest since he had been with the company.

A judgment should be reversed on account of the verdict being excessive where it appears so large as to indicate passion and prejudice on the part of the jury. Whether such is the case is always a difficult question. Sometimes courts hold in such a case that the fault may be cured by ordering a remittitur of a portion of the judgment. Four false arrest cases where the amount of the verdict was challenged by the defendant have been cited by defendant here. The largest verdict in any one of these four was for $5,000. The plaintiff in that case was not taken to jail but was stopped and searched on the street. (*Lewis v. Montgomery Ward & Co.*, 144 Kan. 656, 62 P. 2d 875.) We ordered a remittitur of that verdict to $3,000. In these appeals should we conclude the verdict was too large, the error in the record could be cured by ordering a remittitur since we have concluded that the error of the trial court in the admission of evidence was not prejudicial.

In *Lewis v. Montgomery Ward & Co.*, supra, there was no error requiring a new trial. In dealing with the argument of the defendant that the verdict was excessive we pointed out that the defendant had not objected to an instruction as to the elements proper for the jury to consider in computing actual damages, that is, past and present mental suffering, nervous shock and such damages as appeared to be the reasonable, natural and proper result of such condition and fair and just in view of the injuries sustained without regard to the character of the parties, the needs of the plaintiff or the ability of the defendant to pay. We reviewed the authorities and pointed out there was no fixed rule for computing such damages. Each case must be considered in the light of its own surrounding facts and circumstances. We approved a rule stated in *Hardwick v. Railways Co.*, 114 Kan. 843, 220 Pac. 1043, as follows:

"Error based on an excessive verdict and judgment is seldom an easy question for an appellate court to solve, and it is peculiarly difficult where the sum allowed is for pain and suffering. Of course rules for dealing with excessive verdicts are not altogether wanting; if on reading the record the conscience of the court is shocked at the verdict, a remittitur or reversal is ordered; but there is no uniform yardstick, no hard and fast rule, by which the excessiveness of a verdict can be measured and determined as in ordinary mathematical calculations."

In these cases there were no physical injuries. The testimony of both Mr. and Mrs. Hammargren as to the injury suffered by each in the way of nervous shock and damage to credit was hardly sufficient to warrant the jury in finding the one sustained actual dam-

ages in the amount of $7,500 and the other in the amount of $10,000. Each was awarded $10,000 punitive damages. As already noted, the question of whether a verdict and judgment is so large as to indicate passion and prejudice on the part of the jury or is such as may be cured by a remittitur must depend on the facts in each particular case. She had worked in this store, so it is reasonable to assume the shame and humiliation of being escorted through the store was somewhat greater than as to him.

Under all the surrounding facts and circumstances, we have concluded that Mrs. Hammargren's verdict as to actual damages was too large by $6,500 and should be reduced to $3,500 and that his verdict for actual damages was too large by $4,500 and should be reduced to $3,000. As to punitive damages, each of the plaintiffs was awarded $10,000. In assessing punitive damages the nature, extent and enormity of the wrong, the intent of the party committing it and generally all the surrounding facts and circumstances may be considered. (See *Will v. Hughes,* 172 Kan. 45, 238 P. 2d 478.) We have already set out the pertinent facts and circumstances in this opinion. On account of the fact that the defendants introduced no evidence there is no dispute here as to the ultimate facts. The only dispute actually is the reasonable presumptions that may be drawn from these facts. We have concluded that considering all the above factors the verdicts and judgments for punitive damages were too large by $8,000 as to Mr. Hammargren and by $8,500 for Mrs. Hammargren; that his judgment for punitive damages should be $2,000 and hers should be $1,500.

These two cases were consolidated in the district court. Two separate verdicts and judgments were rendered, however. The order of this court is that Mrs. Hammargren is given the option of accepting $5,000 for both items, within ten days of the filing of this opinion, by filing an acceptance of that amount with our clerk, and Mr. Hammargren is given an option of accepting $5,000 for both items within ten days from the date of the filing of this opinion by filing an acceptance of that amount with our clerk. If the parties exercise that option as directed the judgment so reduced is affirmed. Failing to exercise that option a new trial on the issues generally is ordered.

THIELE, J., concurs in the result.

WERTZ, J., not participating.

WEDELL, J. (concurring): My view may be stated briefly. It is there was slight evidence warranting exemplary damages and meager evidence of substantial actual damages; that the damages awarded, however, were not necessarily due to passion and prejudice of the jury but quite probably the result of a failure to assess damages properly on the basis of the evidence contained in this particular record.

Moreover, in complete frankness I desire to say that in the light of this record and the definite opinion of members of this court with respect to the excessiveness of the verdict I can see no useful purpose in directing a new trial which would probably result in another appeal. I, therefore, concur in the decision which permits appellees to accept the remittitur if they desire to do so.